Robert Earl BADELLE, Appellant–
Petitioner,

v.

STATE of Indiana, Appellee–
Respondent.

No. 49A02–0003–PC–193.

Court of Appeals of Indiana.

July 17, 2001.

Publication Ordered Aug. 6, 2001.

Sarah L. Nagy, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

On June 25, 1979, a jury found Appellant Petitioner Robert Earl Badelle ("Badelle") guilty of murder. The trial court sentenced Badelle to sixty years imprisonment. Badelle's conviction and sentence were affirmed on direct appeal. *See Badelle v. State*, 449 N.E.2d 1055 (Ind.1983). Badelle now appeals the post-conviction court's ("PCR Court") denial of his post-conviction petition challenging his murder conviction. We affirm.

### Issues

Badelle raises eight issues on appeal, which we consolidate and restate as follows:

I. Whether the PCR Court properly excluded the hearsay testimony of Victoria Christ ("Christ") and Katherine Shepard ("Shepard"); and, prior hearsay statements given by James Highbaugh ("Detective Highbaugh");

II. Whether the State violated *Brady v. Maryland;*

III. Whether the PCR Court properly quashed Badelle's subpoena to Stephen Goldsmith ("Goldsmith");

IV. Whether Badelle received ineffective assistance of trial counsel and/or appellate counsel; and,

V. Whether there was sufficient evidence to support Badelle's conviction.

### Facts and Procedural History

The facts, as set forth by our supreme court in Badelle's direct appeal, are as follows:

The facts adduced at trial show that on December 5, 1977, Robert Kannapel, Sr., and his son, Robert, Jr., were working together in a gasoline service station located at 16th and Meridian Streets in Indianapolis. At approximately 3:00 p.m., a man subsequently identified as Appellant Badelle walked into the station to get out of the drifting snowfall and presumably to wait on a ride. Despite the station's policy to the contrary, the Kannapels allowed Badelle to remain inside the front office area. During the next three hours, Mr. Kannapel, Sr., repaired automobiles in the station's service bay area while his son was in and out of the front office attending to the outside gasoline pumps. Several people passed through the station during this period and noticed Badelle loitering. At approximately 5 p.m., neighbor Joe Harris stopped at the station to visit. At approximately 6:00 p.m., Mr. Kannapel,

Jr., left the station to make the station's daily bank deposit before going home. After his departure, Badelle asked Harris to call a cab for him. Harris looked up the number and gave it to Mr. Kannapel, Sr., who proceeded to place the call. Badelle thereupon went into the back office area where Mr. Kannapel, Sr. was. A scuffle ensued. Still in the front office area, Harris heard a gunshot and Kannapel's request for an ambulance. When Harris started into the station's rear area, Badelle confronted him and said that he would be shot if he continued any further. At that time, Harris observed Badelle holding a long-barrelled [sic], silver-colored pistol. Harris left the station and called the police. Vincent Carrol drove up to the station's gasoline pumps just as Harris was leaving and watched another man he described as looking like Badelle leave the station carrying a long-barrelled, silver-colored pistol in his hand. Mr. Kannapel subsequently died from his gunshot wound.

*Badelle v. State*, 449 N.E.2d 1055, 1056 (Ind.1983).

Additional facts found by the PCR Court read as follows:

### FINDINGS OF FACT

1. The petitioner was found guilty of Murder by a jury on June 25, 1979 and was sentenced to 60 years' [sic] imprisonment. He appealed.
2. On June 13, 1983 the Supreme Court of Indiana unanimously affirmed the petitioner's conviction and sentence herein . . . .
3. On June 15, 1987 the petitioner filed a petition for post-conviction relief, which was answered by the State of Indiana on June 24, 1987. Subsequent petitions or amendments were filed by the petitioner on June 29,

1987; August 29, 1989; October 29, 1996 and May 27, 1999. It was the last of these proceedings that set-out the allegations of error presently before the Court.

4. An evidentiary hearing was held in the matter. Said hearing occupied all or part of the following days: September 20, 1999; October 18, 1999; December 2, 1999; and December 3, 1999. During these proceedings the Court heard testimony from 44 witnesses, some of whom testified more than once. Many items of documentary evidence were admitted. From the witnesses['] testimony and other evidence presented, the Court Finds:

The petitioner was tried twice in this cause. The first trial resulted in [a] guilty verdict, but the matter was set-aside by the trial judge, and a new trial was ordered. The setting-aside of the first verdict was due to an alleged Discovery violation by the State, not as a result of an overriding of the jury's determination of guilt. The two trials were presided over by different judges.

Mr. Badelle's first trial was by jury, with the trial beginning on January 22, 1979, and ending on January 23, 1979. The jury found Petitioner guilty as charged.

The Honorable Webster Brewer presided over Petitioner's first trial in January, 1979.

On that same date evidence was heard, in part, on Petitioner's motion for new trial, with the hearing being continued to April 11, 1979. The hearing was finally completed on April 25, 1979, with the Court granting Petitioner's motion for new trial because of newly discovered evidence and the

cause being set for trial on June 4, 1979.

On May 10, 1979, the honorable Webster Brewer, Judge, disqualified himself and presented the parties a panel of three (3) judges from which to select a special judge to preside over the new trial. A Special Venire of 125 persons was also ordered. On May 14, 1979, the Honorable John L. Price was selected and thereafter qualified as Special Judge for the case.

The Honorable John Price presided over Petitioner's second trial in June, 1979.

Attorney Charles Beck served as Mr. Badelle's trial attorney in both trials and was deceased at the time of Mr. Badelle's post-conviction hearing. Mr. Beck died in 1987.

The petitioner was represented on appeal by attorney Patrick E. Chavis III.

On March 8, 1984, Mr. Badelle's file was opened by State PD attorney Shiela Zwickey, who assured him in a letter dated July 5, 1984 that she was still his attorney.

In 1985, Mr. Badelle's Post–Conviction Relief case was transferred to another State PD attorney, Joann Farnsworth, who communicated with Mr. Badelle her intent to proceed with his case.

Petitioner filed his *pro se* Petition for Post Conviction Relief on June 10, 1987.

The State filed its answer to Petitioner's pro se Petition for Post Conviction Relief on June 24, 1987.

Mr. Badelle filed *pro se* an Amended Petition for Post Conviction relief on or about August 1, 1989.

In early 1996, Mr. Badelle chose to retain private counsel in his post-conviction relief matter.

At all times prior to retaining private counsel in 1996, Mr. Badelle relied on the Office of the State Public Defender for representation in this matter.

Mr. Badelle, by counsel, Vincent L. Scott, filed a second Amended Petition for Post Conviction Relief on October 29, 1996.

On or about May 27, 1999, Mr. Badelle, by counsel Yvonne Watkins, filed a third amended petition for post-conviction relief.

In July, 1999, counsel Sarah L. Nagy entered her *pro bono* appearance on behalf of Mr. Badelle.

Appe[l]late counsel for petitioner['s] [direct] appeal [Chavis] tendered [his] brief in October 1981, and when testifying on December 2, 1999, due to the passage of time could not recall a lot about the facts of the case, even after reviewing his brief.

Det. Dennis Morgan was assigned to investigate the murder of Robert Kannapel, Sr., and this assignment was his first assignment as a lead homicide investigator.

According to Deputy Chief Tim Foley, Det. Morgan's Captain in the homicide division from November 1978 until Det. Morgan was removed from the homicide division, Det. Morgan lacked the proper investigative skills to properly investigate a homicide.

Dennis Morgan died in 1995 when he was run over by a car in the street near the Indianapolis Motor Speedway.

Det. James Highbaugh testified in the first trial of Robert Badelle for the defense.

Det. Highbaugh initiated the civil rights complaint with the FBI in August, 1979.

Det. Highbaugh died in 1982.

The IPD Crime Lab had a policy of destroying all physical evidence and case jacket files on any case 10 years old.

On March 25, 1978, a hair sample was taken from Mr. Badelle's head by Detective Dennis Morgan.

No hair sample was entered into the property room log book in this case.

Det. Morgan testified that no hair tests were run because the hat was placed on Mr. Badelle's head for a line-up on March 30th.

The FBI conducted an extensive civil rights violation investigation and provided the U.S. Attorney for the Southern District of Indiana with the evidence gathered. The FBI makes and made no recommendations as to the merit of a case.... A civil rights violation case was never filed by the Office of the U.S. Attorney.

Doug Garrison provided Mr. Badelle's counsel with a copy of the entire FBI file, much of which contained inadmissible hearsay because the declarants were deceased at the time of Mr. Badelle's post-conviction relief hearing.

(PC–R 66–70.) Additional facts will be supplied as needed.

### Discussion and Decision

#### Standard of Review

■ This appeal presents the question of whether post-conviction relief was improperly denied by the PCR Court. Post-conviction proceedings do not afford defendants the opportunity for a "super-appeal." *Conner v. State*, 711 N.E.2d

1238, 1244 (Ind.1999) *cert. denied.* As such, post-conviction appeals do not substitute for direct appeals but provide a narrow remedy for subsequent collateral challenges to convictions. *Id.* Moreover, when our supreme court decides an issue on direct appeal, the doctrine of *res judicata* generally applies, thereby precluding its review in post-conviction proceedings. *Id.*

■ A post-conviction petition under Indiana Post Conviction Rule 1 is a quasi-civil remedy, and as such, the petitioner bears the burden to prove by a preponderance of the evidence that he or she is entitled to relief. *Dickenson v. State*, 732 N.E.2d 238, 241 (Ind.Ct.App.2000). Upon review of a denial of post-conviction relief, the appellate court will not set aside the PCR Court's ruling unless the evidence is without conflict and leads solely to a result different from that reached by the post-conviction court. *Id.* In making this determination, we consider only the evidence that supports the decision of the PCR Court, together with any reasonable inferences to be drawn therefrom. *Id.*

### I. Admission of Evidence—Hearsay

■ The Indiana Rules of Procedure for Post Conviction Remedies provide in relevant part that "[t]he court may receive affidavits, depositions, oral testimony, or other evidence." P–C.R. 1(5). As the admission or exclusion of evidence is within the PCR Court's sound discretion, a reviewing court defers to that court and will not disturb its ruling on review unless it has abused its discretion. *Conner*, 711 N.E.2d at 1258.

#### A. Testimony of Deputy State Public Defender Christ and Detective Morgan's Unsigned Statement

Christ testified as follows at Badelle's PCR hearing:

A: [Christ]: Detective Morgan indicated to me that he was——that Badelle was arrested and a different police officer released Mr. Badelle's photograph to the Indianapolis Star.

. . . .

Q: [PCR counsel]: Okay. But [Detective Morgan] did tell you that he took this photo array over and showed it to Joe Harris and had the newspaper containing Mr. Badelle's picture with the same photo in front of Joe Harris during the photo identification?

A: [Christ]: [Detective Morgan] told me that the Indianapolis Star with the photograph listing Badelle as a suspect was at the station, and the same photo that appeared in the paper was the one that was used in the identification.

(PC–R at 2052–54.) Additionally, Christ presented the following unsigned statement:

### AFFIDAVIT

Comes Now Affiant, Dennis Morgan, being first duly sworn upon his oath, deposes and says the following:

1. I was a homicide detective for the Indianapolis Police Department in the case of *State of Indiana v. Robert Badelle* in 1977–79 under case number 459736E.

2. Badelle was charged in that case with murder of a Texaco gas station operator named Robert Kannapel. The offense was committed on December 5, 1977. The Texaco station was located at the corner of 16th and Meridian in Indianapolis.

3. A man named Joseph Harris witnessed the murder. The owner of the station and the victim's son had briefly viewed the assailant as he stood in the Texaco Station lobby.

4. Badelle was arrested on March 25, 1978, at 1:00 a.m. because of a tip that he looked like the composite drawing of the assailant.

5. In the morning edition of the March 25, 1978, *Indianapolis Star* Badelle's photograph was printed and he was listed as a suspect.

6. In the morning hours of March 25, 1978, I conducted a photographic array with witness Joseph Harris at the Texaco Station. Badelle's photograph was included in the array. The array photograph was the same one that had been published in the newspaper earlier that day. A copy of the Indianapolis Star was in the Texaco Station when Harris identified Badelle as the killer.

7. Badelle's first trial verdict was set aside because a man named Edwin Kennedy had told police officers at the scene after the crime that his car had broken down and the assailant helped to push the car to the Texaco [S]tation. His name had not been listed within the discovery materials given to trial counsel Charles Beck.

8. At the second trial, Kennedy testified that Badelle was not the man who pushed his car to the station on the night of the crime.

9. Harris identified Badelle as the killer during the trial. After he testified Harris asked me in the hallway of the City County Building: "you think he's the one?" When I told Harris that he must be sure he said he guessed that Badelle was the man who shot Kannapel.

10. The jury found Badelle guilty of murder at the conclusion of the second trial.

11. I had asked for assistance from Detective James Highbaugh to investigate this case because this was one of my first cases as a homicide detective. Highbaugh received a tip that a different man had committed the crime. The participants each indicated to Highbaugh that this suspect looked most like the assailant. The participants had previously identified Badelle as the assailant.

12. After the first trial verdict had been set aside, I was asked by Deputy Chief of Investigations, Jack Cottey, to testify at the Board of Captains hearing that James Highbaugh had interfered with my investigation. I testified at the Board of Captains hearing that Highbaugh did not interfere with the case. I was later demoted to street patrol.

13. I do not believe that Robert Badelle was guilty of the murder that occurred on December 5, 1977, at the Texaco Station at 16th and Meridian Streets.

FURTHER AFFIANT SAYETH NAUGHT.

---

Dennis Morgan

(PC–R at 2080–82.) Christ testified that Detective Morgan indicated his intent to sign the above affidavit in a telephone call. The PCR Court excluded Christ's statements and Detective Morgan's purported written statement as inadmissible hearsay. Badelle argues that "[t]hese rulings [are] incorrect because Morgan's statements were admissible under two theories: First, the statements were made against his penal interest because he admitted to a continued pattern of justice obstruction. Second, his statements were admissible because they were statements made against his pecuniary interest. Morgan was an IPD employee when he made these statements in 1994 and he could have been terminated for his admissions relating to the Badelle case." Appellant's Brief at 16.

■ "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay testimony is nevertheless admissible under the statement against interest exception if the declarant is (1) unavailable as a witness and (2) the statement, at the time it was made, was "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Ind. Evidence Rule 804(b)(3).

■ Detective Morgan was deceased at the time of Badelle's post conviction hearing, and was therefore unavailable. Evid.R. 804(a)(4). However, Badelle's loose allegations of possible employment repercussions or civil suits directed towards Detective Morgan from his purported statements, both as relayed by Christ and contained in her written records, fail to convince this Court that such statements were contrary to his pecuniary or proprietary interest or of the sort that would have subjected him to civil or criminal liability. Separately, we note that "[t]he viewing by a witness of a newspaper article containing a photograph of the accused and identifying him as a suspect does not constitute an impermissibly suggestive identification[,]" let alone an act that would subject a police officer to civil or criminal liability. *See Harris v. State*, 619 N.E.2d 577, 581 (Ind.1993). Additionally, Christ's written records, containing the affidavit *form* that was prepared by

Christ but never signed by Detective Morgan, is a document whose contents were not confirmed by oath or affirmation by Detective Morgan. As such, the document lacked the requisite indicia of reliability for its admission into evidence. Similarly, Christ's testimony as to the contents of this document constituted hearsay and was properly deemed inadmissible for failing to consist of statements against interest. The PCR Court did not abuse its discretion when it denied the admission of this evidence.

### B. Testimony of Shepard [1]

 The following testimony by Shepard was stricken as hearsay:

[Shepard]: And so when the three of us [Shepard, Detective Morgan and Officer Willy Larkin] when [sic] into a small room and we started talking and Detective Morgan said to me, I know that Robert, your cousin did not do the crime. He said, I know that he was innocent. And I said, how do you know that, and he said that when the lineup was completed whoever had picked Robert out of the lineup came to me and said, well, do you think we have the right one. And he said, well, I don't know, that's what you're supposed to tell me. And he says, well, don't you think we have the right one, and he says, that's what you're supposed to say. And so he said, Detective Morgan at that time he went to his superior and told him what happened. He told him that he had—that the guy that had picked Robert out of the lineup what he had said to him, and he said that his superior told him to keep his mouth shut because if he didn't do this murder he probably did some other.

(PC–R at 2547–48.) Badelle baldly asserts that the above testimony, which was made during an offer to prove and contains hearsay, and hearsay within hearsay, "is admissible evidence under an exception to the hearsay rule." Appellant's Reply Brief at 1–2. Badelle does not specify which exception is applicable nor cite to any authority in support of his contention. As such, any error regarding this issue is waived. *See* App. R. 8.3(A)(7); *See Bigler v. State*, 732 N.E.2d 191, 196 (Ind.Ct.App. 2000) *trans. denied.*

### C. Detective Highbaugh—Prior Statements to FBI

Badelle further sought to admit statements given by Detective Highbaugh to the FBI, in which Detective Highbaugh asserted his belief that someone other than Badelle murdered Kannapel and that witness testimony was tampered with.[2] The PCR Court excluded Detective Highbaugh's statements on the grounds that they were hearsay. Again, Badelle contends that the PCR Court erred because the statements are exceptions from the hearsay rule as statements "made against pecuniary interest." Appellant's Brief at 16–17; *see also* Appellant's Reply Brief at 10.

 Detective Highbaugh died in 1982, and was therefore unavailable at the time

---

**1.** This testimony purports to relay a meeting that took place in the fall of 1994 between Catherine Shepard (Badelle's cousin), Detective Morgan and Officer Larry Larkin. According to Shepard, the meeting was held at the request of Officer Larkin.

**2.** Both Badelle and the State cite Petitioner's "Offer to Prove" motion for reference to

Highbaugh's statements to the FBI, yet the record does not appear to contain Highbaugh's actual statements, which were denoted Petitioner's Exhibits CCC and DDD at the post-conviction proceeding. Nevertheless, the parties appear to be in agreement as to the content of these statements.

of the post-conviction hearing. Evid.R. 804(a)(4). Additionally, Badelle argues that Detective Highbaugh faced suspension or termination for his statements to the FBI. Detective Highbaugh was in fact terminated from the police force on September 14, 1979. The Indianapolis Police Merit Board cited the following reasons for Detective Highbaugh's termination.

> Police Officer Highbaugh is guilty of violating Sections II(E) and (H); III(A) and (B) and IX(C) of the Rules and Regulations of the Indianapolis Police Department and ... is hereby discharged from the force.

(PC–R 2365.) Section II(E) and (H) read as follows:

> No member shall publicly criticize the department or any of its officers if that criticism is in any way defamatory, obscene, unlawful or tends to impair the efficient operation of the department. Officers who are on suspension are charged with the responsibility of conforming to the department's rules, policies and procedures to the same extent as if he were not on suspension.

(PC–R 2361.)

Section III (A) and (B) provide that:

> No member shall make public comment on the official action of a supervising officer in a detrimental manner.
> No member shall be insubordinate or act with disrespect to any supervising officer.

(PC–R 2362.) Finally, Section IX(C) provides:

> All members shall cooperate with ... the news media but shall not divulge confidential or personal information nor information which might jeopardize any pending criminal or administrative case. All further inquiries by the news media shall be directed to the Public Information Officer.

(PC–R 2362.)

Here, while suspended from the police force[3], and prior to Badelle's second trial, Detective Highbaugh stated to a reporter for the Indianapolis Star "that he stood by his earlier contention that Robert Badelle was innocent and a subject known as Pee Wee was the murderer of Robert Knapple [sic]" and further that "Police Chief Eugene Gallagher and Deputy Police Chief Jack L. Cottey [were] 'racist, gutless men'; and that ... his suspension was the result of pressure from Deputy Police Chief Cottey due to personal conflicts." After reviewing the record it appears that Detective Highbaugh's discharge was the result of a history of offenses and for his violation of the above-cited sections of the Rules and Regulations of the Indianapolis Police Department, not for his belief that Badelle was innocent. Moreover, Badelle fails to present independent evidence that Detective Highbaugh's statements to the FBI violated any IPD policy such that standing alone they could have resulted in his suspension or termination. Accordingly, we do not find these statements to have been made against Highbaugh's pecuniary interests. Again, the PCR Court did not abuse its discretion.

## II. Brady v. Maryland

 The state has an affirmative duty to disclose evidence favorable to a criminal defendant. *See Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

---

**3.** Detective Highbaugh was suspended without pay until such time as his hearing before the Police Merit Board for an incident in which he shot a fellow officer. Prior to this suspension, Detective Highbaugh had been reprimanded and suspended on multiple occasions.

L.Ed.2d 215 (1963)). In *Brady v. Maryland,* the United States Supreme Court held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. To prevail on a claim that the prosecution failed to disclose exculpatory evidence, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *See Farris v. State,* 732 N.E.2d 230, 232–33 (Ind.Ct.App.2000) (citing *Conner v. State,* 711 N.E.2d at 1245–46). Evidence is material only " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley,* 514 U.S. at 433–34, 115 S.Ct. at 1565–1566, 131 L.Ed.2d at 505–506 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.)); *id.* at 685, 105 S.Ct. at 3385, 87 L.Ed.2d at 496 (White, J., concurring in part and concurring in judgment). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Farris,* 732 N.E.2d at 233.

Badelle alleges multiple instances in which the State suppressed material exculpatory evidence. We address each allegation in turn.

### A. Tobin Rice [4]

Rice was a juvenile probation officer at the time of the Kannapel murder. Reginald White ("White") was a probationer whom Rice supervised. Rice testified as follows at the post conviction hearing:

Q: [Post-conviction counsel] Okay. And did you tell anybody from the Indianapolis Police Department about your belief that Reginald White committed the murder?

A: [Rice] Yes.

Q: Who would that be?

A: I called a Detective Highbaugh on the telephone.

Q: Okay. And so what did you tell him?

A: Well, I asked him if he was investigating the crime and he said he was. And, I told him that I had a probationer on my caseload at that time that I suspected may have committed the act.

. . . .

Q: So you told Detective Highbaugh that Pee Wee is the guy who you believe committed the crime?

A: Well, my recollection of the conversation at that time was the [sic] detective Highbaugh was investigating the incident, that his sources had lead him to think that someone by the name of Pee Wee had committed the crime, but I don't think at that time he knew Pee Wee's real name.

Q: Okay. And so were you the one that put Pee Wee together with Reginald White for James Highbaugh?

A: Yes.

(PC–R 2103.) Badelle argues that the existence of Rice and the information he possessed were suppressed by the State, and that had the State informed Defense Attorney Beck ("Trial Counsel") of his existence, Rice would have given material and exculpatory testimony at trial.

■ Here, Detective Highbaugh was called as a defense witness. Therefore, with reasonable inquiry, Trial Counsel

---

4. Rice was not called to testify at Badelle's trial.

could have ascertained Rice's name and information from Detective Highbaugh.

"Evidence cannot be regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence." *United States v. White*, 970 F.2d 328, 337 (7th Cir.1992). Thus, the State will not be found to have suppressed material information where that information was available to the defendant through the exercise of reasonable diligence. *See [U.S. v. ]Parks*, 100 F.3d [1300] at 1307 [ (2nd Cir.1996) ] (citing *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir.1996), *reh'g denied, cert. denied,* [519] U.S. [868], 117 S.Ct. 181, 136 L.Ed.2d 120). As we find the Seventh Circuit's analysis of *Brady*, its elements, and the suppression requirement persuasive, we adopt and use its analysis.

*State v. Nikolaenko*, 687 N.E.2d 581, 583 (Ind.Ct.App.1997). Rice's testimony that he contacted Detective Highbaugh prior to Badelle's trial and Trial Counsel's use of Detective Highbaugh as a defense witness convince this Court that reasonable diligence would have produced Rice's information. *See id.* Moreover, we cannot say that this evidence, if admissible, was material to Badelle's defense. Accordingly, we must affirm the PCR Court's conclusion "that the State did not withhold exculpatory information or evidence as regards information or opinions possessed by Tobin Rice." (PC–R 73.)

### B. Reginald White [5]

Next, Badelle contends that the State intentionally withheld information regarding White. Specifically, Badelle argues

that the State failed to inform Badelle that White was in the service station on December 5, 1977, despite Trial Counsel's supplemental discovery motion which sought information pertaining to several potential witnesses and/or suspects, including Reginald White.

At the PCR hearing White testified in part as follows:

Q: [Post-conviction counsel]: [W]ere you in the [service] station on December 5th, 1977?

A: [White]: Sure I went in there everyday.

Q: Um, did you tell the police that you had been in the station on that day, on December 5th, 1977?

A: They never asked me.

Q: I know, but did you tell them that?

A: I tried to, they told me not to say nothing.

Q: But did you say it to them?

A: Yes.

Q: So they knew, the police knew that you were in the station on December 5th, '77?

. . . .

A: I was there every day [sic], because I went to work every morning.

(PC–R 2792–93.) Additionally, White testified that before entering the service station he helped push a stalled car onto the lot.[6] Testimony at trial indicated that the black male in the service station lobby was the same individual that helped Kannapel Sr. and Kannapel Jr. push Edwin Kennedy's station wagon off of the service station parking lot. Badelle argues that this

---

**5.** White was not called to testify at Badelle's trial.

**6.** This testimony conflicts somewhat with that given by witnesses at Badelle's trial, including

Kennedy, who indicated that his car was pushed *off* the lot, and that the black male who assisted came from inside the lobby of the service station.

information was suppressed by the State at the time of Badelle's second trial.

■ Initially, we consider whether Badelle properly raised this issue before the PCR Court. Failure to raise an alleged error in the petition for post-conviction relief waives the right to raise that issue on appeal. Ind.Post–Conviction Rule 1, § 8; *Perry v. State,* 622 N.E.2d 975, 978 (Ind.Ct.App.1993).

■ . Badelle contends that he presented the above-claimed error to the PCR Court by way of the following paragraph contained in his petition for post conviction relief:

> The Petitioner was denied due process of law, a fundamentally fair trial and appeal, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article One, Sections Twelve, Thirteen and Nineteen of the Indiana Constitution, as a result of the State's withholding of certain exculpatory evidence in its possession, which evidence would have resulted in a different verdict if presented to the jury.

(PC–R 30.) Yet, in the factual paragraph that follows, Badelle focuses exclusively on that information known to probation officer Rice, and the State's failure to identify Rice throughout discovery.

A post-conviction petition "shall be made under oath and the petitioner shall verify the correctness of the petition, the authenticity of all documents and exhibits attached to the petition, and the fact that he has included *every ground for relief under Sec. 1 known to the petitioner.*" Ind.Post–Conviction Rule 1, § 3. (Emphasis added.) At no point within his petition did Badelle identify what exculpatory evidence was allegedly suppressed by the State regarding White. However, it was clear at the post-conviction hearing that Badelle was eliciting testimony from White and others in an

effort to establish that the State had suppressed information pertaining to White, who was a suspect for the murder of Kannapel Sr. Moreover, the State did not object to this testimony as being outside the parameters of Badelle's petition, nor object to Badelle's motion that the pleadings be found to conform to the evidence, a motion which was granted by the PCR Court. Thus, alleged waiver notwithstanding, and in the interest of judicial economy, we proceed to address the first part of Badelle's *Brady*-claim; namely, whether the State suppressed information regarding White.

■ Badelle was aware of White prior to Badelle's second trial. Detective Highbaugh, a defense witness, testified about his investigation of White. Additionally, Prosecutor Whitney testified at the post-conviction hearing that police had located White prior to Badelle's second trial and that Trial Counsel would have known of this contact "twenty-four to forty-eight hours after [Prosecutor Whitney] received it." (R. 1493.) Furthermore, White was called into the courtroom at Badelle's second trial during a portion of Prosecutor Whitney's cross-examination of Detective Highbaugh and asked to stand in front of the jury as well as alongside of Badelle. In light of Detective Highbaugh's investigation and White's availability, Badelle has failed to prove by a preponderance of the evidence that White's presence at the service station on the day of the murder was information suppressed by the State. This information was available to the defense through reasonable diligence.

### C. Serology Tests

■ Badelle counters the State's contention that he waived the issue of suppression of blood tests by quoting the fol-

lowing legal grounds asserted in his petition:

> The Petitioner was denied due process of law, a fundamentally fair trial and appeal, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article One, Sections Twelve, Thirteen and Nineteen of the Indiana Constitution, as a result of the State withholding and subsequently destroying material physical evidence in this case.

(PC–R 31.) Again, however Badelle supports this position with facts unrelated to serology tests. Instead, Badelle focuses on the fact that no report regarding a *hair* analysis was provided to Badelle. As such, Badelle has not properly preserved this issue for appeal. Regardless of possible waiver, testimony at the post-conviction hearing failed to reveal any of the results from the blood tests performed, and all such reports have since been destroyed. Thus, while it appears blood tests were conducted, no blood results exist to indicate whether this evidence was favorable to Badelle's defense. Again, we need not disturb the PCR Court's decision.

### D. Hair Tests

■ A hat was left at the scene of the murder. On March 25, 1978, a hair sample was taken from the head of Badelle. At the post-conviction hearing Prosecutor Whitney testified that "there were hair examples, exemplars taken that were compared with Mr. Badelle's hair, I do remember that." (PC–R 1415.) However, at Badelle's trial Prosecutor Whitney and Detective Morgan gave the following exchange:

> Q: [Prosecutor Whitney] ... The hair in the hat, were there any tests done, or taken, [on] any hair particles?
>
> A: [Detective Morgan] No.

Q Why?

A: Because Mr. Badelle tried the hat on at a lineup and there was no reason to run a test on it, because he tried the hat on five days after the 25th, which was the 30th.

(T.R. 991–92.) Amidst this contradictory testimony, and the omission of a hair sample entry in the property room log book, one fact remains clear; prior to his first trial Badelle informed Trial Counsel that a sample of his hair was taken by police on March 25, 1978. Any test results were thereby available through reasonable diligence. As such, the evidence does not indicate that the State suppressed these test results. There is no *Brady* violation here.

### E. Footprints

On appeal from the PCR Court's decision, Badelle argues that "[t]he State possessed knowledge that there was a discrepancy as to which way the perpetrator ran, and in which direction the footprints of the perpetrator led." Appellant's Brief at 28. Alleged waiver notwithstanding, our review of the record reveals that a preponderance of the evidence does not indicate that the State suppressed information regarding footprints. *See Dickenson,* 732 N.E.2d at 241.

### F. Detective Richard Combs's Investigation [7]

■ Another argument absent from Badelle's post-conviction petition, but asserted at the hearing, was that the State withheld information regarding Detective Combs's investigation. Detective Combs reported to the FBI in 1981 that he searched the establishment of Dick Reedus looking for a bullet that was allegedly fired by Badelle. Detective Combs's search was

---

7. Detective Combs did not testify at Badelle's trial.

in response to information given to police by Reedus that Badelle had visited his store and fired several shots from a gun matching the description of the gun used by the murderer at the service station. Detective Combs did not find a bullet. Reedus testified at Badelle's trial regarding the alleged incident; however, it does not appear from the record that Trial Counsel was aware of Detective Combs's fruitless search, possibly precluding the defense from information with which to impeach the credibility of Reedus.[8] Moreover, Detective Combs's testimony would have been favorable to the defense. However, standing alone, we do not find this information to be material, as there is no reasonable probability that had the evidence been disclosed to the defense the result of Badelle's trial would have been different. *See Kyles,* 514 U.S. at 433–34, 115 S.Ct. at 1565–1566, 131 L.Ed.2d at 505–506.

### G. Detective R.C. Green's Investigation [9]

Badelle further asserts that "the State possessed knowledge of information resulting from Detective Green's investigation that another individual had committed this crime." (PC–R 30.) Again, we choose to address the merits of this claim despite its absence from Badelle's post-conviction petition.

▇▇ Detective Green testified as follows at the post-conviction hearing:

Q: [Post-conviction counsel]: ... [D]o you know anything about the investigation that Detective Highbaugh was conducting?

....

A: [Detective Green]: Only personal knowledge of that would be I too had been asked to work on this case. In my investigation I met up with Detective Highbaugh at this particular location and that's where we shared information. I think Detective Highbaugh had a name [Pee Wee], I had a ... certain floor of a certain apartment where the suspect was hanging out. Detective Highbaugh had a name and a building, and a floor, and that's how we met up.

....

Q: Okay. And so by circumstance or fate, you're both staking out the same place, correct, based on your own each independent confidential informant, or, informant leads, correct?

A: Well, I can't speak for Highbaugh how he arrived at what he did. All I know is Highbaugh was there staking the place out when I drove up and saw him and then we communicated as to what I'm doing and what he's doing.

(PC–R 1890, 1893–94.) Given that Detective Highbaugh testified for the defense, this information was available to Trial Counsel through "reasonable diligence." *See Nikolaenko,* 687 N.E.2d at 583. Accordingly, this information was not suppressed.

### H. Detective Clarence Grant's Investigation [10]

▇▇ Again, alleged waiver notwithstanding, we address Badelle's contention that the State suppressed information communicated to them by Detective Grant. Badelle asserts that Detective Grant, then of the robbery division, informed the homi-

---

8. Reedus was deceased at the time of the post-conviction hearing.

9. Detective Green did not testify at Badelle's trial.

10. Detective Grant testified at Badelle's trial. However, his testimony consisted solely of describing the manner in which IPD mug shot books were compiled.

cide division that a trusted informant placed Badelle away from the crime scene on the day of the murder. Detective Grant testified as follows at the post-conviction hearing:

Q: [Post-conviction counsel]: Okay. Are you aware of any officers in your career with IPD who were disciplined for conducting an independent investigation against the wishes of his or her superiors?

A: [Detective Grant]: Me.

. . . .

A: ... I had picked up some information on some investigations that I had on robberies and I pursued it independently and I was told to turn the information over to the detective that's handling the case.

Q: Did any of that relate at all to Mr. Badelle, the Defendant sitting here today?

A: Yes.

. . . .

Q: And can you tell us about that today, please?

A: A few days after the robbery/homicide at the Texaco station, uh, I contacted a person that gives me good information ... [and] I told him that we had a murder/homicide up on 16th Street and if you get any information, anything, I want you, you know, see if you can find out what took place and who did it. I said right at this time they're searching for a guy named Robert Badelle.

. . . .

A: And he said, no, Badelle couldn't have done that, he said, man, we was hanging out up here at the Drake [Motel] during the time that man was killed at the service station . . . .

. . . .

A: ... So I sent this information ... to the homicide branch ...

. . . .

Q: Mr. Badelle was arrested on March 25th, 1978. Was the conversation with [the informant] after Mr. Badelle was arrested or before?

A: Previous.

(PC–R 1531–32, 1534.) It does not appear from the record that Trial Counsel was made aware of this favorable evidence, or that "reasonable diligence" would have produced this evidence. *See Nikolaenko,* 687 N.E.2d at 583. Moreover, the nondisclosure of a known alibi witness erodes this Court's confidence in the validity of Badelle's conviction. Nevertheless, standing alone, we cannot say that this information would have changed the outcome of Badelle's trial.

### I. Detective Elmer Combs's Investigation [11]

▮ Again, possible waiver notwithstanding, we turn to address Badelle's contention that information known to Detective E. Combs was suppressed by the State. The pertinent testimony from the PC–R hearing is as follows:

Q: [Post-conviction counsel]: Please tell us what you remember about your involvement in [the service station murder case] or in some, I guess, peripheral manner [sic].

A: [Detective E. Combs]: Detective Dennis Morgan asked Detective James Highbaugh to assist him [in the service station murder case], and at the time Detective Highbaugh, myself and another detective, Gilbert Coil were working the northside of Indianapolis. Some kind of way Detective Highbaugh had a lead on a subject

---

**11.** Detective E. Combs did not testify at Badelle's trial.

and I remember going to ... [a] street where—it's a group of ice cream trucks, .... We went over and sat one day for an hour and a half along with a young man, I think his last name was Kennedy.....

Q: Was it Edwin Kennedy?

A: Edwin Kennedy, I'm pretty sure that was the name. And we went over there and sat about an hour, hour and a half, finally an ice cream truck pulled up and a young black male got out of it, and Mr. Kennedy made the statement, that's the man, that's the man that helped me push my car.

 . . . .

Q: Did the name Pee Wee ever come up?

A: Yes, this was supposed to have been the man's nickname, I think his real name was Reginald somebody.

Q: Reginald White?

A: Reginald White, yeah.

(PC–R 1915–17.) Given that both Detective Highbaugh and Kennedy testified for the defense, and were present during the above encounter, the information known to Detective E. Combs was readily available to the defense through the exercise of reasonable diligence. Accordingly, the State cannot be said to have suppressed information concerning Kennedy's identification of White. *See Nikolaenko,* 687 N.E.2d at 583.

12. Harris testified at trial.

13. On the same evening as the service station murder, December 5, 1977, at approximately 8:00 p.m., Aaron Jensen, a cab driver, was robbed. The service station murder and the cab robbery were investigated separately by IPD. However, by the time of Badelle's second trial, Jensen testified that Badelle was the

### J. Joseph Harris [12]

■ Again, possible waiver notwithstanding, we address Badelle's contention that the conditions under which Harris identified Badelle were impermissibly suggestive, and that the State suppressed these conditions from Trial Counsel. As previously noted, "[t]he viewing by a witness of a newspaper article containing a photograph of the accused and identifying him as a suspect does not constitute an impermissibly suggestive identification." *Harris,* 619 N.E.2d at 581 (Ind.1993.) (*See* infra. p. 10.) As such, neither Harris's photo identification or line-up identification, both of which were subsequent to his *possible* exposure to Badelle's picture in the newspaper, constituted "material" evidence under this *Brady* inquiry. *See Farris,* 732 N.E.2d at 233.

### K. Polygraph

■ Again, possible waiver notwithstanding, we consider Badelle's contention that "the State used a defective polygraph examination in violation of the law by reading it to the grand jury, which led to Mr. Badelle's indictment[,]" and "that the defense was not provided with this information." Appellant's Brief at 34. The results of this polygraph examination were not a part of the evidence at Badelle's trial. Therefore, Badelle's argument is not "material" to any issue raised at trial. *See Farris,* 732 N.E.2d at 233.

### L. Cab Robbery [13]

Badelle argues that "[t]he evidence does not support a conclusion that the same

individual who had robbed him that night. Following Badelle's murder trial, a probable cause affidavit was filed which led to Badelle's indictment and subsequent conviction for robbery. In 1981, Badelle was sentenced to fifty-years imprisonment on the robbery conviction, to be served concurrent to his sixty-year murder conviction. Badelle cites exhibit HH from the post-conviction hearing

individual who committed the cab robbery committed the murder[,]" ... [and that] "[t]he State possessed knowledge that Jensen's description of the cab robber differed radically from the description of the murderer ..." [but] "failed to disclose the identity of Jensen to the defense until *one day* before [Badelle's] second trial ...".[14] Again, this issue was not raised in Badelle's petition for PCR, but we nevertheless address it.

 Here, where Trial Counsel was given notice, albeit short notice, of the State's intent to call Jensen to testify, it cannot be held that the State suppressed information known to him. Information known to Jensen was available to Trial Counsel through "reasonable diligence" and therefore was not suppressed by the State. *See Nikolaenko*, 687 N.E.2d at 583.

### M. Gun

Badelle further contends that a gun belonging to Jeffrey Keys, and alleged to have been used in a December 5, 1977 cab robbery, was given to police by Jacqueline Keys and Linda Robinson. Possible waiver notwithstanding, we find that Badelle's citations to the record fail to support such an occurrence.

### N. Jeffrey Keys [15]

Next, Badelle argues that "[he] is entitled to a reversal of his conviction because the State withheld information relating Keys' role in the cab robbery." Appellant's Brief at 40. We address this allegation despite its absence from Badelle's petition. Again, Badelle's citations to the record do not support his theory that the

State suppressed information pointing to Keys as a suspect in the cab robbery.

 However, this Court does treat as newly discovered evidence the following testimony elicited from Keys at the post-conviction hearing:

Q: [Post-conviction counsel] ... I asked you whether you offered to come forward some time during 1994 and admit that you had robbed the yellow cab driver on December 5th for a crime which Mr. Badelle was convicted?

A: [Keys] Yes.

Q: You did offer to come forward, why?

A: I did some cab robberies and if this man is being accused of doing something that I did, he should not be accused of that.

Q: Okay. Did you speak with attorney Victoria Christ about signing an affidavit admitting that you committed the cab robbery on December 5th, 1977, the crime for which Mr. Badelle was convicted ?

A: Yes, I did speak with an attorney.

(PC–R 1781.) This newly discovered testimony is considered alongside Badelle's *Brady* violations, in our reconsideration of whether Badelle received due process. Alone however, this evidence does not undermine confidence in Badelle's murder conviction.

### O. Walter Cowherd [16]

 Badelle further argues that the State suppressed information concerning the whereabouts of a suspect named Cow-

---

as supporting his fifty-year robbery sentence, however exhibit HH does not appear in the record. Nevertheless, the parties do not contest this sentence and it does not bear on the merits of this PCR appeal.

**14.** Jensen was deceased at the time of Badelle's post-conviction hearing.

**15.** Keys did not testify at trial.

**16.** Cowherd did not testify at trial.

herd and the information he possessed. However, Badelle's citations to the record fail to reveal that the State knew of Cowherd's location at the time of trial. Moreover, the subject of statements Cowherd made to Keys, regarding the murder at the service station, were addressed on direct appeal, where our supreme court upheld the trial court's ruling that denied the admission of these statements. We are precluded by the doctrine of *res judicata* from revisiting these issues. *See Conner,* 711 N.E.2d at 1244.

### P. Reward

Badelle alleges "that the State concealed the existence of reward money in this case, which reward was shared by one or more witnesses and also most likely by police officers." Appellant's Brief at 43. Badelle argues that the State's failure to disclose the existence of a reward prevented Trial Counsel from the use of valuable impeachment evidence. We proceed to analyze this argument despite its absence from Badelle's PCR petition.

■■■ Testimony at the post-conviction hearing revealed that there were apparently two rewards offered in relation to the service station murder. The first reward, as reported in the *Indianapolis Star* on February 27, 1978, was for $600.00 and was posted by area merchants. The second reward, as testified to by multiple witnesses (including an IPD officer) at the post-conviction hearing, was for $25,000.00 and was allegedly posted by either the Texaco Corporation or an employee thereof. Information regarding the first of these reported rewards was clearly available to Trial Counsel, as its existence was published several months prior to Badelle's second trial. As such, information

regarding the first reward was not suppressed by the State. As for the reward purportedly posted by Texaco, or an employee thereof,[17] there was no evidence offered at the post-conviction hearing that this reward was ever paid. Accordingly, the only information unknown to Trial Counsel at the time of Badelle's second trial was that a $25,000.00 reward was posted. The absence of this information alone does not "undermine confidence" in Badelle's conviction. *See Farris,* 732 N.E.2d at 233.

### Q. Prosecutor Whitney's "Sweep"

■■■ Badelle also directs this Court to the month prior to his second trial, when IPD conducted a "sweep" of a ten block area immediately north of the service station in an effort to connect any other crimes and/or suspects with the murder of Kannapel Sr. This "sweep" was conducted at the request of Prosecutor Whitney. Badelle complains that the results of this "sweep" were not made known to Trial Counsel. Possible waiver notwithstanding, Badelle has failed to establish that this "sweep" resulted in favorable evidence to his defense.

### R. Detective Morgan

■■■ Lastly, Badelle asserts that Detective Morgan committed perjury, thereby denying him a fair trial. Specifically, Badelle alleges that Detective Morgan offered perjured testimony "regarding his solicitation of Highbaugh's assistance in the investigation, whether hair tests were conducted, whether blood tests were performed on items other than the victim's clothing, and whether [possible suspect] Cowherd had a pierced ear." Appellant's

---

**17.** The Texaco Corporation had no record of the reward offered in this case. However, it could not verify that its records were com-

plete, or that it would have maintained any record of a reward paid by a Texaco Corporation employee.

Brief at 46. While there are discrepancies between Detective Morgan's testimony and testimony heard twenty years later at Badelle's PCR hearing, a preponderance of the evidence does not establish that these discrepancies amounted to perjury.

### Summary of Brady Allegations

 No single alleged *Brady* violation was established as suppressed, favorable to the defense, *and* material to an issue at trial. However, taken together, several of these allegations raise concern as to whether the State's conduct throughout the discovery process impinged upon Badelle's due process rights. Specifically, the omission of information possessed by Detectives Combs and Grant casts some doubt on whether the State provided evidence favorable to Badelle in response to his discovery requests. Nevertheless, the failure to disclose this information did not rise to the level required to reverse the PCR Court's judgment, as Badelle's alleged *Brady* violations and the supporting evidence are not "without conflict and lead[ing] solely to a result different from that reached by the post-conviction court." *See Dickenson*, 732 N.E.2d at 241.

### III. Goldsmith Subpoena

Badelle further argues that the PCR Court erred when it quashed a subpoena propounded to Goldsmith.[18] We disagree.

### Rule of Law

Ordinarily, counsel is not subject to being called as a witness. *Matheney v. State*, 583 N.E.2d 1202, 1206 (Ind.1992), *cert. denied*, 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992). There are exceptions, however, such as when counsel is believed to have material information that cannot be disclosed otherwise. *Id.* Where the evidence is easily avail-

able from other sources and absent extraordinary circumstances or compelling reasons, an attorney who participates in a case should not be called as a witness. *Id.* Generally, a prosecuting attorney cannot be called as a defense witness unless the testimony sought is required by a compelling and legitimate need. *Id.* If the prosecutor does not have information vital to the case, the trial court may appropriately exercise its discretion in denying the defendant's request to examine the prosecuting attorney. *Id.*

*Jordan v. State*, 691 N.E.2d 487, 490 (Ind. Ct.App.1998).

### Analysis

 Badelle issued a subpoena to then-Mayor Goldsmith seeking his testimony regarding, in summary, the following subject areas: (1) the prosecutor's policy on disclosing exculpatory evidence under the rubric of *Brady v. Maryland* and prevailing standards at the time; (2) the prosecutor's policies for handling evidence and disclosing knowledge of potential witnesses; (3) Goldsmith's discussions with deputy prosecutor Larry Whitney regarding the *Badelle* case; (4) the handling of blood and hair evidence in the *Badelle* case; (5) knowledge of reward monies being received by the prosecutor's office; and, (6) the conduct of deputy prosecutor Whitney. Goldsmith did not appear at the post-conviction hearing, but responded to these areas of inquiry by way of the following affidavit.

1. I [Stephen Goldsmith] took office as Marion County Prosecutor on January 1, 1979.

2. At all times during my tenure as Marion County Prosecutor, it was the policy of my office to fully comply

---

18. At the time of Badelle's trial, Goldsmith was Marion County Prosecutor.

with all requirements regarding the disclosure of exculpatory evidence to defense counsel, including the requirements set forth in *Brady v. Maryland*. My instructions to my subordinates was [sic] that if there were areas where it was uncertain whether disclosure should be made, they should go ahead and provide disclosure.

3. I spoke frequently with Larry Whitney on [a] number of matters, probably including the Badelle case. I do not recall the contents of any of those conversations.

4. At no time have I have [sic] learned that there was any evidence withheld from the defense in the Badelle trial, or that there were any forensic or other tests conducted for which the results were not provided to Mr. Badelle's counsel. I have no recollection of speaking with Mr. Whitney regarding a serology report or a written hair and trace analysis report.

(PC–R 538–39.)

Here, while there was a compelling and legitimate need for some of the information Badelle requested, that need was met through Goldsmith's affidavit and the testimony provided by Whitney. Specifically, both Goldsmith and Whitney indicated that it was the policy of the prosecutor's office to make available all State's evidence. Moreover, Whitney testified that this practice held true for the *Badelle* case, testifying that his complete *Badelle* file was made available to Trial Counsel. Additionally, the record concerning the State's handling of blood and hair evidence was more than adequately reconstructed at the post-conviction hearing. Goldsmith had no recollection regarding these tests or the contents of other conversations he had with Whitney, and as such did not possess material information that could have affected

the PCR Court's judgment. Lastly, this Court does not find Badelle's insinuations of improper receipt of reward monies or actions by Whitney outside of the *Badelle* case to be adequately supported by the record. The–PCR Court did not abuse its discretion when it quashed Badelle's subpoena of Goldsmith.

### IV. Ineffective Assistance of Trial Counsel and Appellate Counsel

#### A. Rule of Law

 Initially, we note the well-established law invoked when a defendant argues he received ineffective assistance of counsel.

Indiana analyzes claims of ineffective assistance of counsel according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Lowery v. State*, 640 N.E.2d 1031, 1041 (Ind.1994). First, we require the defendant or petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. *Id.* This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Id.* (citing *Turner v. State*, 580 N.E.2d 665, 668 (Ind.1991)). Second, we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived the defendant or petitioner of a fair trial. *Lowery*, 640 N.E.2d at 1041. We will conclude that a fair trial has been denied when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unreliable. *Id.* (citing *Best v. State*, 566 N.E.2d 1027, 1031 (Ind.1991)).

*See also Sanchez v. State,* 675 N.E.2d 306, 310 (Ind.1996).

*Wisehart v. State,* 693 N.E.2d 23, 38 (Ind. 1998.) *cert. denied.* Moreover, "[i]t shall strongly be presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Smith v. State,* 678 N.E.2d 1152, 1156 (Ind.Ct.App. 1997) (quoting *Bellmore v. State,* 602 N.E.2d 111, 123 (Ind.1992)). Further, the standard of review for claims of denial of the right to effective appellate counsel is the same as that used for trial counsel. *Minnick v. State,* 698 N.E.2d 745, 754 (Ind.1998). Finally, as Badelle is appealing the denial of his petition for post-conviction relief, he faces the additional hurdle of convincing this Court that the evidence, as a whole, leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *See Haynes v. State,* 695 N.E.2d 148, 153 (Ind. Ct.App.1998). As Badelle raises numerous ineffective assistance of counsel claims, several of which concern the merits of issues already addressed in this opinion, we turn now to discuss those issues which remain, beginning with those assertions that relate to Trial Counsel.

### B. Trial Counsel—Analysis

#### 1. Mistaken Identity Instruction

■ We review trial court decisions concerning instructions for an abuse of discretion. *Emerson v. State,* 724 N.E.2d 605, 608 (Ind.2000). Here, Badelle asserts that Trial Counsel was ineffective for failing to tender a jury instruction on the issue of mistaken identity. We disagree.

In *Emerson,* the defense's theory was mistaken identity and the defense counsel tendered an instruction that told the jury "it could consider conditions such as lighting that might affect a witness's ability to observe, whether a witness's later identifi-

cation was the product of his or her own recollection as opposed to some other influence, and so on." *Id.* Our supreme court held that the trial court properly rejected defense counsel's tendered instruction, finding that the trial court's more general witness credibility instruction adequately covered the identification issue.

■ In the present case, the trial court instructed the jury regarding the State's burden of proof and informed them that they were the exclusive judges of the evidence and witness credibility. Given *Emerson,* had Trial Counsel tendered a more specific instruction regarding mistaken identity it may or may not have been appropriate, (or for that matter strategically advantageous for Badelle), but regardless, its absence cannot be said to amount to ineffective assistance. Therefore, the PCR Court did not abuse its discretion when it determined that Trial Counsel's failure to tender an instruction addressing mistaken identity did not amount to ineffective assistance of counsel.

#### 2. Pre–Indictment Right to Counsel

■ Badelle further asserts that Trial Counsel was ineffective for failing to include pre-indictment right to counsel claims in his motion to correct error. Again, we disagree.

The guarantees of an accused's right to counsel in both the Sixth Amendment and Art. I, Section 13 of the Indiana Constitution apply "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Jones v. State,* 655 N.E.2d 49, 54 (Ind.1995) (quoting *U.S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). The application of this rule depends upon whether the chal-

lenged event occurred at a "critical stage" of the proceedings. *Manley v. State*, 410 N.E.2d 1338, 1342 (Ind.Ct. App.1980). The proper test for determining whether a particular proceeding is a "critical stage," to which the assistance of counsel guarantee applies, is whether the defendant is confronted with the intricacies of the law or the advocacy of the public prosecutor or prosecuting authorities. *Williams v. State*, 555 N.E.2d 133, 136 (Ind.1990). In this state, *the commencement of prosecution is governed by Ind.Code § 35–34–1–1 in which the filing of an information or indictment begins the formal criminal process. Little v. State*, 475 N.E.2d 677, 683 (Ind.1985)

. . . .

*We find no support for the assertion that the right to counsel can attach earlier than the initiation of criminal proceedings.*

*Callis v. State*, 684 N.E.2d 233, 238 (Ind. Ct.App.1997) (emphasis added). Accordingly, Trial Counsel was not ineffective for failing to raise those issues pertaining to Badelle's lack of representation prior to his indictment.

### 3. Unduly Suggestive Pre–Trial Line-up

Next, Badelle argues that Trial Counsel was ineffective for "fail[ing] to object to the unduly suggestive line-up at the start of the second trial." Appellant's Brief at 60; Reply Brief of Appellant at 15. However, Badelle fails to support this contention with relevant citations to the record or caselaw. Moreover, "[t]he cases hold that regardless of error in pretrial identification procedures or their suggestiveness if there is sufficient basis for identification independent of the pretrial procedure, there is no error in permitting the in-court identification." *Filler v. State*, 421 N.E.2d 1146, 1148 (Ind.Ct.App.1981).

Here, several witnesses made *proper* in court identifications (*see* supra "5. In-court Identification of Badelle"), thereby preventing any evidence admitted from an allegedly improper pretrial identification procedure from causing any prejudice to Badelle. Accordingly, we do not find Trial Counsel's failure to object amounts to ineffective assistance of counsel.

### 4. Trial Counsel's Pre Trial Investigation

Additionally, Badelle argues that Trial Counsel was ineffective for failing to conduct a reasonably satisfactory pre-trial investigation that would have uncovered additional witnesses favorable to his defense. Again, we disagree.

Indiana caselaw provides that effective representation requires adequate pretrial investigation and preparation. *Hernandez v. State*, 638 N.E.2d 460, 461 (Ind.Ct.App.1994). However, it is also well established that this court should resist judging an attorney's performance with the benefit of hindsight. *Id.* at 462. As this Court recognized in *Hernandez*, our Supreme Court has squarely addressed the concerns of second-guessing an attorney's judgment:

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"

*Hernandez,* 638 N.E.2d at 462 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–695).

■ Here, Trial Counsel's defense was premised upon mistaken identity. In support of this defense, Trial Counsel put forth evidence showing that the service station owner, Piles, identified White as the loiterer inside the station on the day of the murder at a line-up conducted on May 24, 1979.[19] Further, witness Kennedy testified that Badelle was *not* the individual who assisted him in pushing his car off the service station lot. Additionally, Trial Counsel challenged the competence of witness Harris and cross-examined witness Kannapel Jr. regarding inconsistencies in his identification statements and testimony. Also, Trial Counsel elicited testimony from Detectives Highbaugh and Morgan regarding the multiple suspects considered by IPD during the course of their investigation. Clearly the foregoing is not an exhaustive list of the evidence that Trial Counsel presented to the jury, however it suffices for our purposes of determining whether Trial Counsel provided adequate pretrial investigation and preparation. Trial Counsel's efforts were more than adequate to support his defense of mistaken identity. Accordingly, Trial Counsel's decision not to call or seek out additional witnesses was a judgment call "within the wide range of reasonable professional assistance." *See id.*

### 5. In-court Identification of Badelle

Badelle also asserts that Trial Counsel was ineffective for failing to object to the in-court identifications offered by witnesses Harris, Piles, and Kannapel Jr. We disagree.

■ Whenever a claim of ineffective assistance is based on a failure to object, the defendant must demonstrate that a proper objection, if made, would have been sustained by the trial court. *Cossel v. State,* 675 N.E.2d 355, 361 (Ind. Ct.App.1996). Here, each of the aforementioned witnesses sufficiently relayed the facts under which they viewed the alleged perpetrator to lay an adequate foundation for their in-court identifications. Thus, Trial Counsel's failure to object did not render his performance unreasonable.

### 6. Prior Bad Acts

■ Next, Badelle argues that Trial Counsel was ineffective for failing to move to suppress Badelle's prior bad acts and/or criminal activity. Specifically, Badelle contends that failure to file a motion in limine regarding Badelle's criminal history resulted in the prejudicial testimony of Detectives Morgan and Highbaugh. However, while the jury could have inferred from Detective Morgan's testimony regarding the line-up process that Badelle had a criminal record, any such prejudice was sufficiently cured by the trial court's admonishment to the jury. (*See Lay v. State,* 659 N.E.2d 1005, 1009 (Ind.1995)) (holding in part that a timely and accurate admonition is presumed to cure any error in the admission of evidence and that the trial court is in the best position to judge the potential impact on the jury of such testimony.) Moreover, Trial Counsel could not have reasonably anticipated that

---

19. Piles was the owner of the service station at the time of the December 5th, 1977 murder. Piles visited the service station on the day of the murder and viewed the black male who was waiting in the lobby area. (T.R. 1590.) Thereafter, Piles viewed four line-ups conducted by IPD, two conducted on March 30, 1978 and two conducted on May 24, 1979. On March 30th, 1978, Piles selected Badelle in both line-ups (one conducted without a hat and one conducted with a hat), but on May 24th, 1979, Piles selected White in both line-ups. Badelle and White did not appear in the same line-up. (T.R. 1619.)

his own witness, Detective Highbaugh, would reference Badelle's prior arrests. Trial Counsel's failure to file the proposed motion in limine did not render his assistance ineffective.

### 7. Competency of Harris

Badelle bases his next ineffective assistance claim on Trial Counsel's failure to make an offer to prove regarding the competency of witness Joe Harris. The trial record shows that Trial Counsel objected to Harris's competency, but was overruled by the trial court.

The competency of a challenged witness is to be decided by the trial court as a matter of law. *Kimble v. State,* 262 Ind. 522, 525, 319 N.E.2d 140, 143 (1974). When the trial court has found a witness to be competent, the reviewing court will interfere only if there is a manifest abuse of discretion. *Morris v. State,* 172 Ind.App. 509, 513, 360 N.E.2d 1027, 1029 (1977). Here, as the State notes, Harris's testimony indicated that he was able to hold a job, live by himself, pay his bills, and further that he understood the difference between the truth and a lie. In light of such testimony, the trial court's ruling that Harris was competent to testify was not an abuse of its discretion, and Trial Counsel's decision not to further pursue or preserve the matter, through an offer to prove, was within the realm of effective assistance.

### 8. Double Jeopardy

Badelle further contends that Trial Counsel "failed to properly argue the double jeopardy claim ..." Appellant's Brief at 69. We disagree.

Trial Counsel did present a double jeopardy argument in the form of a motion to dismiss. This motion adequately set forth the double jeopardy argument and we will not second-guess Trial Counsel's efforts.

### 9. Impeachment of Robinson

Badelle argues that Trial Counsel failed to object to the impeachment of witness Linda Robinson. However, the record indicates otherwise, as Trial Counsel lodged the following objection during Robinson's testimony:

> The use of someone's arrest record cannot be used unless it's to impeach that witness, and then it has to be for an impeachable offense under *Ashton v. Anderson.*

As such, Badelle's claim is without merit.

### 10. Impeachment of Detective Moistner

Additionally, Badelle argues that Trial Counsel "failed to impeach [Detective Moistner's] credibility based upon his prior history of police misconduct and also failed to impeach him regarding his misrepresentation to the court about locating [possible suspect] Cowherd." Brief of Appellant at 70. Badelle fails to support these factual allegations by citation to the record, and we are not inclined do so for him.

### 11. Sentencing

Lastly, Badelle argues that Trial Counsel "failed to provide Badelle with adequate representation at the sentencing phase of the proceeding." Brief of Appellant at 70. Specifically, Badelle complains that Trial Counsel failed to provide mitigating factors in support of his defense. However, Badelle fails to put forth evidence that any mitigating circumstances existed. As such, Badelle has failed to meet his requisite burden for establishing inadequate representation.[20]

---

20. Since Badelle has failed to establish that any single alleged error amounted to inadequate representation by Trial Counsel, we need not separately address Badelle's final contention of cumulative error.

### B. Appellate Counsel—Analysis

 At the outset of this section we note that it is the responsibility of appellant to support his argument on appeal with appropriate citations to legal authorities as well as to appropriate sections of the record. *Marshall v. State,* 621 N.E.2d 308, 318 (Ind.1993). Without citation to legal authority in addition to citation of the record, we cannot determine the merits of the claim and, thus, consider the issue waived. *Id.*

#### 1. Double Jeopardy

Again, Badelle asserts the claim that counsel was ineffective for failure to raise a double jeopardy claim based upon his retrial. We disagree.

 The Double Jeopardy Clause provides that no person will "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This prohibition applies to the states via the Fourteenth Amendment. *Mason v. State,* 689 N.E.2d 1233, 1238 (Ind.1997). The clause protects people from, among other things, a second prosecution for the same offense after conviction. *Id.* However, where there is sufficient evidence to support a defendant's convictions, there is no double jeopardy bar to a retrial. *Robinette v. State,* 741 N.E.2d 1162, 1168 (Ind. 2001). Here, Badelle's conviction was supported by sufficient evidence, (*see supra.* "*V. Sufficiency of the Evidence* "), and therefore Appellate Counsel was not ineffective for not raising a double jeopardy claim.

#### 2. Gerald Keys

Next, Badelle argues that "Badelle was not given ample opportunity to pursue exculpatory evidence from Gerald Keys, which caused a trial result that was fundamentally unfair and unreliable." Brief of Appellant at 75. However, Badelle fails to support this argument with citation to the record or caselaw, and we are not inclined to do so for him. *See Marshall,* 621 N.E.2d at 318.

#### 3. Motion for Continuance

Further, Badelle asserts that "Appellate [C]ounsel failed to raise the issue of the trial court's denial of the motion for continuance to locate [Walter] Cowherd." Appellant's Brief at 25. Again, this argument is made devoid of record cites or supporting caselaw, and we are not inclined to address it. *Id.*

#### 4. Dismissal of Jurors

Badelle argues that Appellate Counsel was ineffective for failing "to appeal the error resulting from the trial court's dismissal of two jurors [from the jury pool] without a showing of prejudice or bias." Appellant's Brief at 76. We disagree.

 Article 1, Section 13 of the Indiana Constitution guarantees to a defendant the right to an impartial jury. Accordingly, a biased juror must be dismissed. *Joyner v. State,* 736 N.E.2d 232, 238 (Ind.2000). Whether to excuse a juror for cause rests within the sound discretion of the trial court. *Wisehart v. State,* 693 N.E.2d 23, 55 (Ind.1998). We will sustain the trial court's decision unless it is illogical or arbitrary. *Id.* Here, two prospective jurors were dismissed from the jury *pool* because they were present in the courtroom during discussion between the trial court and counsel. We need not analyze whether the trial court properly established cause for these dismissals as we find any effect from that decision to be too remote to have prejudiced Badelle's trial. Accordingly, Appellate Counsel was not ineffective for not raising this issue in Badelle's direct appeal.

#### 5. Badelle in Handcuffs

Badelle contends that Appellate Counsel "failed to preserve on appeal the error

resulting from the trial court's denial of Badelle's motion for mistrial due to at least two (2) jurors having seen him being escorted with other prisoners and in handcuffs during the course of the trial." Brief of Appellant at 77. We disagree.

Trial Counsel sought a mistrial based on the jurors' observations. A ruling on a motion for a mistrial is made within the trial court's discretion. *Bergfeld v. State*, 531 N.E.2d 486, 491 (Ind.1988). Additionally, the fact that a defendant has been seen by jurors while being transported in handcuffs is not a basis for reversal, absent a showing of actual harm. *Id.* Further, in *Bergfeld*, our supreme court held that "[e]ven if there was evidence that the jurors did in fact see [defendant] handcuffed, appellant has shown no prejudice because jurors would reasonably expect that anyone in police custody would be restrained, regardless of the nature of the charge against the accused." *Id.* Similarly, Badelle has failed to show prejudice, and as such we cannot hold that Appellate Counsel was ineffective for not presenting this issue on direct appeal.

### 6. Aaron Jensen

Next, Badelle argues that Appellate Counsel "failed to preserve on appeal the error resulting from the trial court's denial of Badelle's motion to suppress the testimony of State's witness Aaron Jensen [cab driver] when that testimony contained inadmissible references to the [sic] Badelle's unrelated crimes." Appellant's Brief at 77. Again, however, this argument is made without supporting record cites or precedent. As such, it is waived. *See Marshall*, 621 N.E.2d at 318.

### 7. Walter Cowherd's Earring

Badelle further asserts that Appellate Counsel was ineffective for failing to address the trial court's refusal to let two witnesses testify. While the majority of these two witnesses' testimony was precluded on the grounds of hearsay, a ruling affirmed by our supreme court, Badelle alleges that it was error for the trial court not to allow these witnesses to testify that Walter Cowherd, who at one time was under investigation for the Kannapel murder, wore an earring in his left ear, similar to Badelle. Badelle argues that this testimony was essential in light of Jensen's testimony that the man who robbed him was wearing an earring in his left ear. Again, this argument is made absent citation to the record or supporting caselaw, and is therefore waived. *See Marshall*, 621 N.E.2d at 318.

### 8. Polygraph

Badelle also argues that Appellate Counsel was ineffective for failing "to preserve the issue that the trial court erred in overruling trial counsel's objections to the polygraph evidence relating to [Walter] Cowherd." Appellant's Brief at 79. Again, this argument is unsupported by citations to the record or caselaw, and thus is waived. *Id.*

### 9. Denial of Continuance

Badelle argues that Appellate Counsel was ineffective for failing to preserve the issue that the trial court erred in denying Trial Counsel's motion for continuance to retrieve Detective Morgan. Again, this assertion is presented without proper citation to the record or supporting caselaw, and is therefore waived. *Id.*

### C. Conclusion

Isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel unless, taken as a whole, the defense was inadequate. *Brown v. State*, 698 N.E.2d 1132, 1139 (Ind.1998) *cert. denied.* Furthermore, we

"will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind.1998.) Here, Badelle has failed to substantiate any error, by either Trial Counsel or Appellate Counsel, which would convince this Court that he received an inadequate defense.

### V. Sufficiency of the Evidence

Badelle contends that there is insufficient evidence to sustain his conviction. This argument was not asserted in Badelle's direct appeal. Generally, allegations of errors not raised on direct appeal are considered waived for purposes of post-conviction relief. *Green v. State*, 525 N.E.2d 1260, 1261 (Ind.Ct.App.1988). However, a conviction without sufficient evidence constitutes fundamental error, and fundamental error may be raised in a post-conviction proceeding, within the rules of post-conviction procedure. *Id.* Here, we choose to address Badelle's sufficiency of the evidence argument.

A single eyewitness's testimony is sufficient to sustain a conviction. *Emerson v. State*, 724 N.E.2d 605, 609–10 (Ind.2000). Moreover, any inconsistencies in identification testimony go only to the weight of that testimony, as it is the task of the jury to weigh the evidence and determine the credibility of the witnesses. *Id.* at 610. This Court does not weigh the evidence or resolve questions of credibility when determining whether the identification evidence is sufficient to sustain a conviction. *Id.* Instead, we look to the evidence and the reasonable inferences therefrom which support the verdict of the jury. *Id.*

Here, at the first line-up that included Badelle, conducted on March 30, 1978, six men stood in front of witnesses Harris, Piles, Kannapel, Jr., and Kennedy. The line-up participants were first viewed without a hat and then viewed with the hat recovered from the scene. Harris identified Badelle when adorned with the hat; Piles identified Badelle in both line-up arrangements; Kannapel, Jr. identified Badelle without the hat; and Kennedy made no identification. Subsequent inconsistencies at trial in identification testimony remained a matter of evidentiary weight and witness credibility, areas squarely within the province of the jury. As such, there was sufficient evidence to sustain Badelle's conviction.

Affirmed.

FRIEDLANDER, J., and MATTINGLY–MAY, J., concur.

### ORDER

This Court having heretofore handed down its opinion on July 17, 2001, marked Memorandum Decision, Not for Publication;

Comes now the Appellant, by counsel, and files herein Motion to Publish Decision in this Case, Which said Motion is in the following words and figures, to-wit:

### (H.I.)

And the Court, having examined said Motion and being duly advised, now finds that said Motion should be granted and that this Court's opinion in this appeal should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. The Appellant's Motion to Publish is granted and this Court's opinion heretofore handed down in this appeal on July 17, 2001, marked Memorandum Decision,

Not for Publication, is now ordered published.