## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 11 2016, 6:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Akeem Carpenter,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | August 11, 2016<br><br>Court of Appeals Case No.<br>45A03-1510-CR-1746<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Diane Ross Boswell, Judge<br><br>Trial Court Cause No.<br>45G03-1405-MR-4 |

**Brown, Judge.**

[1]  Akeem Carpenter appeals his conviction for murder in the perpetration of a robbery. Carpenter raises two issues which we revise and restate as:

    I.    Whether the trial court abused its discretion in instructing the jury after deliberations had begun; and

    II.    Whether the evidence is sufficient to sustain Carpenter's conviction.

We affirm.

### *Facts and Procedural History*

[2]  Carpenter lived with Jarell Williams on Magoun Avenue in Hammond, Indiana, for about a week. At some point, Williams told Carpenter that he had to stay somewhere else, but Carpenter stayed with Williams on the night of March 11, 2014, because he did not have anywhere to go.

[3]  On March 11, 2014, Noe Fernandez was returning to his home on Magoun Avenue, which was situated across the street from where Yueh Ju Wu lived, and saw what appeared to be an elderly woman wearing a gown and using a walker to walk on the side of the street. Fernandez slowed down, looked at the person, and realized it was a man. After Fernandez pulled into his driveway, the person "stood up vertically" and called Fernandez's first name. Transcript at 108. Fernandez did not recognize him at first, and the man, Carpenter, told Fernandez that it was "Akeem from Campagna," where Fernandez was a youth care specialist. *Id.* at 109. Fernandez asked Carpenter why he was dressed like an old lady, and Carpenter said that he was filming a YouTube video and that his camera crew dropped him off. Fernandez did not see a

camera crew, and he observed a roll of duct tape on Carpenter's waistline, talked more with him, went inside, and thought that "something was just – it just wasn't right . . . ." *Id.* at 111. Fernandez looked out his window and observed Carpenter again walking like an elderly woman.

[4] On March 12, 2014, Wu, his pregnant fiancée Tayanda Davis, and Abel Garcia lived on Magoun Avenue in a green house less than one mile from La Milpa, a Mexican market. Wu sold marijuana for income and had approximately $5,000 cash in his house. That afternoon, Wu and Davis were home when Nicholas Swets, Carlos Cuadrado, and Raul Pacheco arrived around 4:30 to 5:00 p.m., and the men played video games.

[5] Nicole Heaps drove Matthew Reeves to Wu's house where Reeves planned to pick up marijuana, and Reeves entered Wu's house while Heaps stayed in her car. While she was waiting, Heaps observed two black males walking down the street towards her. The men walked right past her car, and one of the men pulled on the door to Wu's house, but it did not open. The men then walked around to the other side of the house. Heaps also observed a green Buick that passed by when she first arrived at the house and then came back again and was traveling "a little bit under the speed limit, so it looked like a little weird." *Id.* at 350.

[6] At some point inside the house, there was a loud commotion downstairs and someone said: "Everybody get down. Hammond PD."[1] *Id.* at 166. Wu looked at Swets and "gave [him] the look like, is this police or not." *Id.* at 418. Pacheco and Cuadrado jumped out the window and ran in the backyard towards the street. Wu grabbed his gun, left the room, and asked who it was. Davis then heard multiple gunshots, and Wu returned to the bedroom.

[7] Wu then crouched down, and a black man stood in the doorway of the bedroom and looked at Davis. Davis later described the man as "taller, maybe five-eight, five nine, had a brown hat on with some gold writing on it, a brown jacket, some blue jeans, brown boots. . . . He was a little bit like of a heavy weight, but not like too heavy." *Id.* at 170. She also stated that the man's hair was "like curly but like really nappy thick," not braided, and was "[s]hort, like kind of cropped as if he maybe cut it three, four weeks ago." *Id.* at 209. Wu started shooting, and the man shot back and left. Wu said, "Tay, I've been shot," and then fell down. *Id.* at 172. Davis called the police and later discovered that a panel was kicked out of a door downstairs. Wu died as a result of his injuries.

---

[1] Davis testified that Wu left the bedroom with Reeves, walked Reeves out, and returned to the bedroom. She also testified that about five minutes later, there was a loud commotion downstairs that sounded like scuffling or a cabinet opening and closing. Reeves testified that he went to Wu's house to purchase marijuana, that during the middle of the transaction, someone yelled "Hammond PD," there was a loud noise, and Reeves jumped out of the window. Transcript at 245.

[8] At some point, Reeves exited the house, entered Heaps's car, and told her to go. As Reeves and Heaps were leaving the scene, they saw two black males running or "sort of speed walking" from the house and lost sight of them when one ran towards an apartment complex and the other ran towards a store. *Id.* at 347. Reeves called the police and told them that shots were fired at a house and told them the street name.

[9] That same day, Linda Sapyta, who lived on Magoun Avenue, observed a black man with dreadlocks and wearing camouflage pants and a tan knit cap running down the center of the street towards 169th Street around 5:30 p.m. The man ran past a fruit stand and turned left. Sapyta also observed another black man wearing black pants, a black jacket, and a blue and white checkered flannel shirt trailing behind the first man. The second man kept looking back over his shoulder to see what was going on behind him. Naomi Page also lived on Magoun Avenue and observed two black males running north from a green house. She later identified one of the men as Carpenter noting that he looked very panicked, was wearing camouflage pants, and had "moppy, short, dreadlockish hair." *Id.* at 460.

[10] That same day "[a] little bit after 5:00," Carpenter knocked on Williams's door, and Williams opened the door. *Id.* at 449. Carpenter was sweating, out of breath, and scared, and he told Williams that he "got into some trouble down the street," specifically that someone shot at him and he had to fire back. *Id.* at 443. Carpenter was with a man that Williams did not know, and the other man asked Carpenter the location of the gun. Carpenter told him: "outside." *Id.* at

444. Carpenter changed his clothes and left Williams's house after about thirty minutes.

[11]     Hammond Police Master Sergeant Allan Retske was called to the scene of the shooting and observed a "brilliant white" piece of paper as he was walking up to the front door of the house which was a receipt from a jerk chicken restaurant and which he thought was not something that had been there for a long time. *Id.* at 530. After obtaining the video surveillance from La Milpa and the jerk chicken restaurant, the police identified Carpenter as a suspect. At some point, Carpenter called Williams and asked him to change his statement.

[12]     On March 18, 2014, Hammond Police Detective Nicole Duncanson spoke with Carpenter and advised him of his rights. Detective Duncanson showed him a photo from the video from the La Milpa store and the jerk chicken restaurant, and Carpenter admitted that it was him. Detective Duncanson showed him a copy of the original receipt from the jerk chicken restaurant, and he stated that it was his receipt and that was his order. Carpenter talked about people running with "bangers," which refers to guns. *Id.* at 723. He said he went to play basketball with friends at the Lincoln Center earlier in the afternoon on March 12th, they discussed "hitting a lick," which was a robbery, of Wu, but that he told the others "not to hit the lick." *Id.* at 731, 757. At one point during the interview, Carpenter stated that he was not the lookout and then another time said that he was. He told the detective that he did not go all the way into the house, that it was two other people, and described what he could see from across the street including people through a window. He told her that he was

climbing through the hole in the door and demonstrated doing that, and said that the only houses he knew on Magoun Avenue were those belonging to Fernandez and Williams but that he knew Wu.

[13] On May 13, 2014, the State charged Carpenter with one count of murder and one count of felony murder. In February 2015, the State filed an amended information charging Carpenter with Count I, murder; Count II, murder in the perpetration of a burglary; and Count III, murder in the perpetration of a robbery.

[14] In July and August 2015, the court held a jury trial. Fernandez, Sapyta, Davis, Reeves, Heaps, Swets, Detective Duncanson, and others testified. Portions of Detective Duncanson's interview of Carpenter were played for the jury.

[15] After the jury began deliberations, the court indicated that the jury sent a question of "What is the legal definition of burglary and robbery." *Id.* at 823. The court stated that "[t]he parties have met and consulted. The decision is that they will be given the statutory definition of burglary and robbery." *Id.* Carpenter's counsel objected, stating:

> I have an objection to giving them the definition for either robbery or burglary. Those were not available during the closings. We – I don't even recall the State going into either of those. If they did, they certainly didn't go into it in any detail. The State had ample opportunity to review the instructions and had approved them in the form that they were originally given to the jury, and therefore, I object to those being included or supplied at this later time.

*Id.* at 824.  The court stated:

> Well, according to the new jury rules, it is permissible to give supplemental information to jurors if it will be beneficial to them in terms of helping them reach their – their verdict.  I think the definitions of burglary and robbery are certainly – the defendant is charged with murder in perpetration of a burglary and murder in perpetration of a robbery, and the definitions would be beneficial, so those are going to be given.

*Id.* at 824-825.  The court informed the jury that "BURGLARY is defined by Statute in the State of Indiana as follows: A person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits Burglary."  Appellant's Appendix at 129.  The court also informed the jury that "ROBBERY is defined by statute in the State of Indiana as follows: A person who knowingly or intentionally takes property from another person by using or threatening the use of force on any person or by putting any person in fear commits Robbery, a felony."  *Id.* at 130.

[16]  The jury found Carpenter not guilty of Count I and guilty of Counts II and III, and on September 18, 2015, the court held a sentencing hearing.  The court vacated judgment on Count II, murder in perpetration of a burglary, and entered a sentence of fifty years on Count III, murder in the perpetration of a robbery.

## *Discussion*

### I.

[17]   The first issue is whether the trial court abused its discretion in instructing the jury after deliberations had begun. Carpenter argues that the court erred by failing to reread the entire set of instructions and by failing to read the additional instructions and instead sending written copies back to the jury, thereby prejudicing his substantial rights. Specifically, he asserts that the court violated his right to have the jury determine the law and the facts and his right to due process.

[18]   The State contends that the court properly gave the jury the statutory definitions of burglary and robbery in response to the jury's request during deliberations. It points out that none of the initial instructions defined burglary and robbery, the jury was instructed that it was to consider the instructions as a whole, and that the jury was able to refer to the instructions at any time.

[19]   The generally accepted procedure in answering a jury's question on a matter of law is to reread all instructions in order to avoid emphasizing any particular point and not to qualify, modify, or explain its instructions in any way. *Martin v. State*, 760 N.E.2d 597, 601 (Ind. 2002). However, the Indiana Supreme Court has permitted departure from this procedure when a trial court is faced with an omitted and necessary instruction or must correct an erroneous instruction, as long as it is "fair to the parties in the sense that it should not reflect the judge's view of factual matters." *Id.* (quoting *Jenkins v. State*, 424 N.E.2d 1002, 1003 (Ind. 1981)). Thus, "when the jury question coincides with an error or legal lacuna [i.e., gap] in the final instructions . . . a response other than rereading from the body of final instructions is permissible." *Id.* (quoting

*Jenkins*, 424 N.E.2d at 1003). We review a trial court's manner of instructing the jury for an abuse of discretion. *Inman v. State*, 4 N.E.3d 190, 200 (Ind. 2014).

[20] Ind. Code § 34-36-1-6 is titled "Retirement for deliberation; request for information" and provides:

> If, after the jury retires for deliberation:
>
> > (1) there is a disagreement among the jurors as to any part of the testimony; or
> >
> > (2) the jury desires to be informed as to any point of law arising in the case;
>
> the jury may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or the attorneys representing the parties.

The Indiana Supreme Court has discussed Ind. Code § 34-36-1-6 in addressing jury instructions in a criminal case. *See Campbell v. State*, 19 N.E.3d 271, 275-276 (Ind. 2014); *Inman*, 4 N.E.3d at 201; *see also Wray v. State*, 720 N.E.2d 1185, 1189 (Ind. Ct. App. 1999) (observing that the Indiana Supreme Court has found a predecessor to Ind. Code § 34-36-1-6 applicable to criminal proceedings), *trans. denied*. "Under appropriate circumstances, and with advance consultation with the parties and an opportunity to voice objections, a trial court . . . may directly answer the jury's question (either with or without directing the jury to

reread the other instructions)." *Inman*, 4 N.E.3d at 201 (quoting *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind. 2002)).

[21] Under Ind. Code § 34-36-1-6, the trial court was obligated to respond to the jury's inquiry into the definitions of burglary and robbery, points of law. *See id.* This is what it did. Even if its provision of the definitions was not mandated by Ind. Code § 34-36-1-6, the trial court had the discretion to respond to the jury's question. *See id.* (citing *Foster v. State*, 698 N.E.2d 1166, 1170 (Ind. 1998)). To the extent Carpenter suggests that his substantial rights were prejudiced, we observe that the initial instructions did not include definitions of robbery and burglary, that Instruction No. 16 stated in part that "you are not to single out any certain sentence or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole, and you are to regard each instruction in light of all of the others," and that Instruction No. 20 stated in part that "you are to consider the instructions as a whole and not single out any one instruction to the exclusion of the other instructions." Appellant's Appendix at 122, 126. Under the circumstances, we cannot say that the trial court abused its discretion in instructing the jury. *See Inman*, 4 N.E.3d at 200-202 (holding that the trial court did not abuse its discretion in sending the jury a note providing the jury with a definition of "asportation," that the trial court was obligated under Ind. Code § 34-36-1-6 to respond to the jury's inquiry into the definition of "asportation," a point of law, and that was

exactly what the trial court did when it sent the jury a note providing the definition).[2]

## II.

[22] The next issue is whether the evidence is sufficient to sustain Carpenter's conviction. He argues that the State failed to present sufficient evidence that he aided, induced, or caused another person to commit murder in the perpetration of a robbery, and that, even though he was seen running down the street after the shooting with another individual, there is no indication that either Carpenter or the individual with whom he was running were the ones who went into Wu's residence and shot him. He concedes that the fact he was seen in the vicinity of the house that was robbed the day before the robbery is of concern, but states that the fact he called out to Fernandez and identified himself indicates there was no improper motive in his presence on the street at that time. He points to his interview with the police and states that he admitted that the individuals he played basketball with were friends prior to the crime, that they discussed robbing Wu, but that he told the men not to rob Wu and denied being the lookout for the robbery. Carpenter also asserts that the supposed admission he made to Williams was contradicted by the facts that no

---

[2] The court in this case referred to the Jury Rules without mentioning a specific rule. In *Inman*, the trial court mentioned Jury Rule 28, and the Indiana Supreme Court held: "Although in its discussion with counsel the trial court referred to Ind. Jury Rule 28, which is triggered only where the jury has reached an impasse, and though such reference was inaccurate, in this case its actions were completely correct under Ind. Code § 34-36-1-6." 4 N.E.3d at 201.

weapon was ever recovered, that Davis described a man with blue pants as the one who shot Wu, and that Carpenter was clearly wearing camouflage pants around the time of the shooting. The State's position is that the evidence is sufficient to demonstrate that Carpenter participated in the commission of the crime either as a principal or as an accomplice.

[23] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990). Identification testimony need not necessarily be unequivocal to sustain a conviction. *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996). Inconsistencies in identification testimony impact only the weight of that testimony, because it is the jury's task to weigh the evidence and determine the credibility of the witnesses. *Gleaves v. State*, 859 N.E.2d 766, 770 (Ind. Ct. App. 2007) (citing *Badelle v. State*, 754 N.E.2d 510 (Ind. Ct. App. 2001), *trans. denied*).

[24] The offense of felony murder is governed by Ind. Code § 35-42-1-1, which provided at the time of the offense that "[a] person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits

murder, a felony."[3]  The offense of robbery is governed by Ind. Code § 35-42-5-1, which provided at the time of the offense that "[a] person who knowingly or intentionally takes property from another person or from the presence of another person: (1) by using or threatening the use of force on any person; or (2) by putting any person in fear; commits robbery . . . ."[4]

[25]  The jury was also instructed regarding accomplice liability.  Ind. Code § 35-41-2-4 provides that "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense . . . ."  "'[A]n accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence' of their concerted action." *McGee v. State*, 699 N.E.2d 264, 265 (Ind. 1998) (quoting *Vance v. State*, 620 N.E.2d 687, 690 (Ind. 1993)).  It is not necessary that a defendant participate in every element of a crime to be convicted of that crime under a theory of accomplice liability.  *Bruno v. State*, 774 N.E.2d 880, 882 (Ind. 2002), *reh'g denied*.  In determining whether there was sufficient evidence for purposes of accomplice liability, we consider such factors as: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of the crime; and (4) course of conduct before, during, and after occurrence of the crime.  *Id.*  A defendant's mere presence at the crime

---

[3] Subsequently amended by Pub. L. No. 158-2013, § 410 (eff. July 1, 2014); Pub. L. No. 214-2013, § 35 (eff. July 1, 2014); and Pub. L. No. 168-2014, § 65 (eff. July 1, 2014).

[4] Subsequently amended by Pub. L. No. 158-2013, § 450 (eff. July 1, 2014).

scene, or lack of opposition to a crime, standing alone, is insufficient to establish accomplice liability. *Tobar v. State*, 740 N.E.2d 109, 112 (Ind. 2000). A person's intent "may be determined from their conduct and the natural consequences thereof" and "intent may be inferred from circumstantial evidence." *Coleman v. State*, 546 N.E.2d 827, 831 (Ind. 1989), *reh'g denied*. It is within the province of the jury to draw an inference of knowledge or intent from the facts presented. *Whatley v. State*, 908 N.E.2d 276, 284 (Ind. Ct. App. 2009) (citing *Gibson v. State*, 515 N.E.2d 492, 496 (Ind. 1987)), *trans. denied*.

[26] The record reveals that Fernandez observed Carpenter dressed and walking like an elderly woman with a roll of duct tape on his waistline and thought something "just wasn't right" on the day before the murder. Transcript at 111. On the day of the murder, Heaps drove Reeves to Wu's house and observed two black males walk down the street towards her, that one of the men pulled on the door to Wu's house, and that the men then walked around to the other side of the house. After Wu was shot, Davis discovered that a panel was kicked out of a door downstairs. Davis testified as to her description of the shooter. Page identified one of the men running and looking very panicked as Carpenter. Sapyta and Page testified that they witnessed two black men running down Magoun Avenue at a time shortly after the shooting and provided a description of the men. The jury was able to consider these descriptions along with its observations of Carpenter in the courtroom and in the exhibits of the surveillance videos and police interview.

[27] Williams testified that that same day and "[a] little bit after 5:00," *id.* at 449, Carpenter knocked on Williams's door, was sweating, out of breath, and scared, and told Williams that he "got into some trouble down the street," specifically that someone shot at him and he had to fire back. *Id.* at 443. He testified that Carpenter was with a man whom Williams did not know, the other man asked Carpenter about the location of the gun, and Carpenter told him: "outside." *Id.* at 444. Sometime later, Carpenter called Williams and asked him to change his statement.

[28] Sergeant Retske discovered a receipt from a jerk chicken restaurant outside of Wu's house and thought that it was not something that had been there for a long time. Carpenter admitted that he was on the surveillance video from the jerk chicken restaurant and La Milpa, that the receipt belonged to him, and that he discussed robbing Wu that afternoon, but stated that he told others not to rob Wu. At one point during the interview, Carpenter stated that he was not the lookout and then another time said that he was.

[29] Based upon the evidence favorable to the conviction, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found Carpenter guilty beyond a reasonable doubt of murder in perpetration of a robbery.

## *Conclusion*

[30] For the foregoing reasons, we affirm Carpenter's conviction.

Baker, J., and May, J., concur.