## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 23 2020, 10:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Richard Chambers,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 23, 2020

Court of Appeals Case No.
19A-CR-1611

Appeal from the Marion Superior
Court

The Honorable Mark D. Stoner

Trial Court Cause No.
49G06-1804-MR-11024

**Brown, Judge.**

[1] Richard Chambers appeals his conviction for murder and claims the evidence is insufficient to sustain his conviction. We affirm.

## *Facts and Procedural History*

[2] On March 29, 2019, Jason Schnitzmeyer drove Chambers, his friend of about five years, to a house on the 4700 block of Longworth Avenue in Lawrence where Schnitzmeyer lived with his girlfriend.

[3] The next morning Schnitzmeyer exchanged text messages with Brad McKinney about a potential transaction involving a drone.[1] At some point around "mid-morning, early morning," Elizabeth Tucker drove west on 48th Street, and turned south onto Longworth Avenue, on which she lived. She drove past two males standing by the front of Schnitzmeyer's red truck dressed for the "still pretty chilly" weather and wearing Carhartt-type jackets, and saw that a yellow extension cord lay on the ground by the truck and that no van or other car was present. Transcript at 45.

[4] At around eleven o'clock, Regina McVitty, who lived directly next door to Schnitzmeyer and had known him for ten years, sat in her living room by a "big

---

[1] Specifically, in communication with McKinney's phone, Schnitzmeyer sent a message at 9:00 a.m. that stated, "Hey what's up buddy are you shopping right now at work"; he sent a message at 9:30 a.m. that stated, "What's good cause I probably got about a half to a whole G that I'm trying to get rid of"; he received a message at 9:33 a.m. that stated, "rt on I got another drone and I gon get a braclet or something women jewelry umm I got that Blu-ray player and Bluetooth boom box"; he sent a message at 9:39 a.m. that stated "You want to come over you can and we will work something out"; he sent a message at 9:50 a.m. that stated "I'm trying to get this truck it going so I can get to where I need to go"; and he received a message at 9:52 a.m. that stated, "ill head that way now." Exhibits Volume at 185-186.

picture window" that "takes up pretty much the whole living room," had a good view of the street, and noted that the day was "a little chilly," "wasn't actually raining," and had a "kind of spring feeling actually for once." *Id.* at 12, 15. At some point, when she heard a "bang-bang" that occurred in instant succession and "sounded like two gunshots that were really close," she looked out her window and "immediately . . . saw" Schnitzmeyer standing in the "big patch of the grass" in front of his house. *Id.* at 17-18. McVitty observed that he

> was frantic, he was upset, he was jumping up and down, he was throwing up his hands, he was saying things like, "How could you do that? What were you thinking? How could you do that? What were you thinking? I can't believe you did that."

*Id.* at 18. She saw a body in the street five feet away from him, that Schnitzmeyer faced down the street, and that he had nothing in his hands. She observed him throw down his coat and run into the house. By the time she went to retrieve her phone to call 911, a police vehicle had arrived at the scene.

[5] Meanwhile, Lawrence Police Officer Jeffrey Gray had parked his police car in a southeastern direction in the parking lot of the firehouse located at 4751 Richardt Avenue, when he heard through the open car window two "pops" that came from a location to the east. *Id.* at 65. At 10:59 a.m., he radioed a report on potential shots fired. He drove through an alley just north of 47th Street connecting Richardt and Longworth Avenues and, arriving at the intersection, saw Chambers who, wearing a "green like winter jacket, like Carhartt type jacket," looked directly at him, made a motion with his hands by "moving them

left and right" by his waist, and headed past the police vehicle directly south at a quick jog. *Id.* at 66, 68. No one else besides Chambers was on the street. Officer Gray believed that Chambers was "attempting to get out of the area quickly." *Id.* at 66. Turning north, Officer Gray observed Chambers using his rearview mirror, watched as he "headed towards a receptical [sic] for trash or recycling that was to the south of that alley," and observed him cross the street to the east side of Longworth Avenue. *Id.* at 68. Arriving at Schnitzmeyer's house, Officer Gray saw a male on his back on the ground at the rear of a tan van, and he observed, through his rearview mirror, Chambers travel eastbound on 47th Street before losing sight of him. He radioed a description of Chambers and requested that somebody investigate the trash cans which Chambers had gone "directly towards." *Id.* at 74. Schnitzmeyer emerged from the house and advised Officer Gray that the individual had been shot by someone else, and Officer Gray discovered the victim, who was out later determined to be McKinney, had sustained an injury to the head. An unopened box containing a video-streaming drone lay next to the body.

[6] Responding to the radio dispatch, Lawrence Police Officer Havis Harris approached the three trash bins in the area that Officer Gray had observed Chambers, looked inside one of the bins with an open lid, and discovered it was empty except for a firearm submerged in water. At 11:08 a.m., Officer Harris radioed the discovery of the firearm and its location. The firearm, a "Ruger single six 22 revolver," contained an empty chamber and three fired cartridge cases. *Id.* at 169.

[7] Lawrence Police Officer Brian Sharp responded immediately to the area of Richardt Avenue and 45th Street after hearing a dispatch from an officer who reported speaking with a postal worker on Longworth Avenue who indicated she had seen the described suspect continue to run south from 47th Street. Other officers responded to the south 46th Street area as well.

[8] Julia Timmons, who lived on the 4500 block of Vernon Avenue, was inside her kitchen looking out a window when she saw Chambers walking through her neighbor's yard and into her driveway. Timmons exited her house and asked him if she could help him "because he looked lost," and he responded: "No, that's all right. I'm running." *Id.* at 55. Chambers kept on walking "and proceeded into [her] fence." *Id.* at 56. She stated she needed him to leave her yard or she would call the cops, and he responded: "That's okay. I'm running from them." *Id.* She entered her house to call 911 and, during the call, watched Chambers climb over her fence and move through her neighbor's yard toward Payton Avenue. Officer Sharp received a dispatch advising him of Timmons's call, drove his vehicle to the side of the house immediately behind hers on Payton Avenue, and parked on the street. After exiting his vehicle, he heard a crash that sounded to him like "some trash cans being collided with," and he apprehended Chambers. *Id.* at 86. Chambers "appeared to be wet, muddy" and was "wearing a t-shirt, which it was a very cool day that day," "out of breath," and "appeared to be perspiring on the face/forehead area." *Id.* at 89. In apprehending him, Officer Sharp gave several orders – "Get on the ground," "Don't move" – and, in response to Chambers "immediately

jump[ing] up and attempt[ing] to turn on toward" him after the first handcuff was placed on his right wrist, restrained him against a nearby vehicle. *Id.*

[9] After securing Chambers, Officer Sharp searched with another officer for the green jacket Chambers was initially seen wearing and discovered a "broken fence where it appeared that [Chambers] jumped based on the abrasion we saw on his forearm" and that the broken fence post appeared to have dry wood and "every other wood around it was soaked and saturated." *Id.* at 90. They drove to Vernon Avenue, walked the yards on the street until Timmons's house, spoke with her, and "continue[d] to walk a path of least resistance back to where the shooting occurred on Longworth." *Id.* at 91. After they walked across 46th Street and through "kind of an access area alleyway" to Payton Avenue, they came upon Chambers's green jacket and a pair of black gloves on the ground in a "driveway fenced-in area." *Id.* Though the ground around the items was wet and saturated, the items were dry.

[10] Officers investigating the scene of the shooting entered Schnitzmeyer's house and a shed in the backyard and located two separate DVR camera systems. Though they were unable to recover video from the system that monitored the front of the house, officers did recover video recordings from the motion-activated system that monitored the shed. They discovered in the shed a box containing a semi-automatic handgun with a magazine that contained ten rounds and was at capacity. Officers also recovered the cell phones of the victim, Schnitzmeyer, and Chambers.

[11]     On April 4, 2018, the State filed charges against Schnitzmeyer and Chambers as co-defendants and charged Chambers with McKinney's murder.[2] Chambers later filed a motion for severance from his co-defendant which the court granted.

[12]     At a bench trial, the court heard testimony from Schnitzmeyer's girlfriend, McVitty, Tucker, Timmons, Officers Gray, Harris, and Sharp, as well as Lawrence Police Detective Jeremy Kurth, forensic pathologist Dr. John Cavanaugh, crime scene specialist Samantha Kristner, and Indiana State Police Sergeant Brian Bunner. It admitted State's Exhibit 2, an aerial map depicting an area from Longworth and Richardt Avenues north of 47th Street to Payton and Vernon Avenues south of 46th Street, pinpointing the relevant addresses and location.

[13]     The court admitted footage of Officer Gray's body-mounted camera as State's Exhibit 19, the State played "pertinent parts" of the beginning of its footage, and Officer Gray indicated Schnitzmeyer was the white male that appeared with a jacket half-on and a cell phone in his hand. *Id.* at 72. As the footage begins on State's Exhibit 19, a male with a checkered flannel garment can be seen. Officer Gray testified that ninety seconds to two minutes was an approximation of the length of time from the moment he heard the gunshots until he radioed a description of Chambers.

---

[2] The State also charged him with one count of unlawful possession of a firearm by a serious violent felon as a level 4 felony, but the count was later dismissed.

[14] The court admitted a photograph of McKinney on the ground taken by Officer Gray immediately after arriving at the scene as State's Exhibit 13. Dr. Cavanaugh testified that he performed an autopsy on McKinney and, when asked if the bullets were a smaller caliber, he indicated that they were "small or medium." *Id.* at 122. He also testified that McKinney would have had "immediate loss" of consciousness. *Id.* at 118.

[15] The court admitted the recovered revolver as State's Exhibit 85, and Kristner indicated that the cylinder had a clockwise rotation and that the cartridge "that was currently under the hammer was one of the ones that was fired, as well as the two on both sides of that." *Id.* at 169. Detective Kurth answered affirmatively when asked if, based on Kristner's description of the revolver as found, "the location of those two empty casings, one at twelve o'clock and one at one o'clock, would that have been the positions of the casings had the gun recently been fired twice." *Id.* at 218. He indicated the cartridge casings are not ejected with a revolver, the cartridges would be ejected with the firing of a semi-automatic such as was in the shed, and that no shell casings were found on the ground at the scene.

[16] Regarding Chambers's green jacket and the black gloves that were recovered, the court admitted photographs of the residence on Payton Avenue at which the items were discovered and of the items as they had been found as State's Exhibits 29 and 30, respectively. Detective Kurth indicated he was able to view the video of, and create still shots from, the DVR located in the shed; identified images taken from the footage on March 30, 2018, which the court admitted as

State's Exhibits 98-101[3]; and testified regarding State's Exhibit 98 that Schnitzmeyer, the individual on the left, wore a "checkered flannel," and Chambers, the individual on the right, wore a green jacket and blue jeans. *Id.* at 140. He testified State's Exhibit 100, a still shot of an individual wearing a green jacket and blue jeans, was significant because he was "notified by crime lab that one of the gloves, the left glove had a deformity on the thumb," and he pointed to the deformity on the left glove in State's Exhibit 101. *Id.* at 141. The court admitted an up-close photograph of a left glove as State's Exhibit 79, and Kristner testified she reported to the back yard of the residence on Payton Avenue and observed a defect on the thumb of the left glove, which the red circle on the image in State's Exhibit 79 notes.

[17] The court admitted a stipulation signed by Chambers's counsel as State's Exhibit 102 which stated Chambers placed a call on April 2, 2018, from the Marion County Jail at 10:00 PM to a certain number and the call lasted twenty-five minutes and thirty-nine seconds. The court admitted a recording of the call as State's Exhibit 103 and played "from 7:22 to 15:25, 18:15 to 26."[4] Transcript at 97. State's Exhibit 103 contains a recording of the phone call with a date of

---

[3] The court admitted as State's Exhibit 94 a stipulation which stated an Indiana State Police computer forensic analyst had determined that the correct time reflected in State's Exhibits 98 and 99 would be between 8:59 a.m. and 9:59 a.m.

[4] The statement in the transcript that "State's Exhibit 102 is played" appears to be a scrivener's error. Transcript at 97.

"20180402," time of "22:00," and duration of "25 Min. 39 Sec.," during which

the following conversation occurs between Chambers and a female voice:

Female: Been on the news since it happened.

Chambers: Yeah I just need to know, who is it saying that I –
that I – supposedly killed?

Female: Huh?

Chambers: Who is saying that I supposedly killed?

Female: You don't know?

Chambers: I don't know.

Female: That – I don't remember who they said the name was,
but like it was a forty-one year old guy or something.

Chambers: Yeah. I mean I know who it supposedly was, right,
I'm just saying that sh-t like that for a reason, Hope,[5] on this
phone.

* * * * *

Chambers: What was that dude's name, Hope?

Female: I don't know, hold on. . . . Brad McKinney.

Chambers: Hey! Brad McKinney. Brad McKinney. The dude I
shot was named Brad McKinney supposedly.[6]

* * * * *

---

[5] On appeal, the State asserts that the woman identified in the call is named "Hope." Appellee's Brief at 14.

[6] These statements appear to be made to someone other than the female on the phone.

Chambers:  Whatever happened don't have nothing to do with what you told me, Hope.

* * * * *

Female: . . . if I wouldn't have did what I did, then you wouldn't have been as . . . crazy as you were . . .

Chambers:  I'm crazy anyway, Hope, I mean . . .

Female:  I know, but I didn't help none.

Chambers:  I made my own decisions, okay.  You know when I decided to go off in that what happened out there happened . . . didn't have nothin' to do with how you . . .

Female:  I know I just thought if you wouldn't have been out there and been in whatever situation you were in.  If I wouldn't have just . . . I'd have just been there.  I'd a just came over if I had just been with you.

* * * * *

Chambers:  Just remember the anger that you got, you got the same kind of anger I do.  Don't let it unleash one day 'cause you're lookin' at what, you're lookin at what happens . . . if you let it go too far.  You end up in situations that are irreversible you know what I mean?

State's Exhibit 103 at 7:18-7:47, 12:56-13:57, 22:01-22:04, 22:43-23:20, 25:27-25:49.  At closing, the prosecutor argued in part that, in the jail calls, Chambers "knows he killed someone but he's just saying the word 'supposedly' for a reason" and that the reason was "because he knows he's on that phone and he knows he's being recorded."  Transcript at 224.

[18]   The court found Chambers guilty of murder and sentenced him to fifty-eight years to be served in the Department of Correction.

## *Discussion*

[19]   The issue is whether the evidence is sufficient to sustain Chambers's murder conviction. He argues it is only known that he placed the revolver in the trash can and that it "cannot be known for certain" why he fled with it. Appellant's Brief at 13. In essence, he argues that the evidence does not definitively point to whether he was the shooter and that competent evidence and a strong reasonable inference suggest Schnitzmeyer may have been the shooter. Contending mere presence at the crime scene or the failure to oppose the crime is insufficient proof to support a conviction, he asserts there is a dearth of evidence regarding "what transpired during the drone deal," the reason that someone shot McKinney, and "whether he was disposing of a gun or the gun used to shoot" McKinney. *Id.* at 14. He further contends: the State did not call a ballistics/firearms examiner and yet "argued the revolver was likely the weapon to shoot" McKinney; that Schnitzmeyer "owned two 22 caliber firearms, including the revolver"; and his "offhand chat with cell mates" was not an admission of guilt whereas the use of the word "supposedly" was a description of the allegations against him and not a confession. *Id.* at 13-14.

[20]   The State maintains that the revolver fired the two shots that struck McKinney, that Chambers admitted his guilty participation in that shooting when he ran away with that gun and tried to hide it, his attempts to conceal his identity is indicative of his guilt, and his contrary arguments suggesting Schnitzmeyer was

the real killer are simply invitations to reweigh the evidence and draw inferences favorable to him.

[21] When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[22] Ind. Code § 35-42-1-1 provides that a person who knowingly or intentionally kills another human being commits murder. A conviction for murder may be sustained on circumstantial evidence alone. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016) (citing *Green v. State*, 587 N.E.2d 1314, 1315 (Ind. 1992)). Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Drane*, 867 N.E.2d at 147. Identification testimony need not necessarily be unequivocal to sustain a conviction. *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996). Inconsistencies in identification testimony impact only the weight of that testimony, because it is the task of the trier of fact to weigh the evidence and determine the credibility of the witnesses. *See Gleaves v. State*, 859 N.E.2d 766, 770 (Ind. Ct. App. 2007)

(citing *Badelle v. State*, 754 N.E.2d 510 (Ind. Ct. App. 2001), *trans. denied*). As with other sufficiency matters, we will not weigh the evidence or resolve questions of credibility when determining whether identification evidence is sufficient to sustain a conviction. *Holloway v. State*, 983 N.E.2d 1175, 1178 (Ind. Ct. App. 2013). Rather, we examine the evidence and the reasonable inferences therefrom that support the verdict. *Id.*

[23]     To the extent that Chambers suggests that his flight from the murder scene when police arrived cannot be considered as evidence of his guilt, we observe that the Indiana Supreme Court, in *Willis v. State*, wrote:

> [T]his Court has held "[t]he fact that a defendant flees or does not flee does not indicate either guilt or innocence *of itself . . .* " *Dill v. State*, 741 N.E.2d 1230, 1232-33 (Ind. 2001) (finding trial court error in giving the jury a flight instruction). We elaborated, "it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses." *Id.* at 1233 (quoting *Alberty v. United States*, 162 U.S. 499, 511 (1896)) (alteration omitted). Thus, something more than running from the scene is necessary in order to infer Willis' guilt.

27 N.E.3d 1065, 1067 (Ind. 2015) (emphasis added). In *Willis*, the only evidence connecting the defendant to the crime of criminal trespass was his flight from the police near the scene of the trespass. *See id.* at 1067-1068. Thus, his flight from the scene was insufficient to support his conviction. *Id.* at 1068.

[24] Less than a month later, our supreme court reaffirmed the general rule that "'[e]vidence of flight may be considered as circumstantial evidence of consciousness of guilt.'" *Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (quoting *Brown v. State*, 563 N.E.2d 103, 107 (Ind. 1990)), *reh'g denied*. "Additionally, '[e]vidence of an attempt to avoid arrest [also] tends to show guilt.'" *Id.* (quoting *Wilson v. State*, 455 N.E.2d 1120, 1123 (Ind. 1983)). Thus, while something more than fleeing from the scene by itself is necessary to infer guilt, such flight may be considered as circumstantial evidence of consciousness of guilt, which, combined with other circumstantial evidence, may be sufficient to support a conviction.

[25] The record, taken most favorably to the trial court's ruling, reveals Tucker saw two males wearing Carhartt-type jackets at Schnitzmeyer's house during the early or mid-morning of March 30, 2019, before McKinney arrived. Between 8:59 a.m. and 9:59 a.m., Chambers exited the shed wearing a green jacket and a pair of gloves with a deformity on the thumb of the left glove. McVitty looked out her window when she heard what sounded like two gunshots, immediately saw Schnitzmeyer holding nothing in his hands, and saw McKinney on the ground in the street, who died after being shot twice. Alerting to the intersection of Richardt and Longworth Avenues to investigate, Officer Gray observed Chambers look directly at him, make a motion at his waist with his hands, and attempt to quickly leave the area. As Officer Gray headed north to discover McKinney's body, he watched Chambers head toward a trash can and then cross the street and travel on 47th Street. Investigation of the trash can in

the area where Officer Gray had observed Chambers revealed a single-action revolver that had empty casings at twelve o'clock and one o'clock, which were consistent with the firearm having been recently fired twice. Timmons testified Chambers looked lost and would not leave her property when asked and that, when she mentioned calling the cops, he told her that he was running from them. After apprehending Chambers several blocks southwest of the shooting, officers discovered a fence he had broken while jumping over and, later along the "path of least resistance" from Timmons's house to the scene of the shooting, his jacket and the gloves he wore shown in the DVR footage. Transcript at 91.

[26] Based upon the record, we cannot say the inferences made by the trier of fact here were unreasonable. We conclude that evidence of probative value exists from which the court as the trier of fact could have found Chambers guilty beyond a reasonable doubt of murder. Chambers's arguments alleging Schnitzmeyer murdered McKinney are invitations to reweigh the evidence, which we cannot do.

[27] For the foregoing reasons, we affirm Chambers's conviction.

[28] Affirmed.

Baker, J., and Riley, J., concur.